Decree affirmed and appeal dismissed, at costs of appellants.

---

## APPEAL OF SCRANTON ELEC. L. & H. CO.

[SCRANTON ELEC. L. & H. Co. v. SCRANTON ILL. H. & P. Co.]

FROM THE COURT OF COMMON PLEAS OF LACKAWANNA COUNTY, IN EQUITY.

Argued June 1, 1888—Decided October 1, 1888.

1. As the primary object of the institution of a corporation is the public welfare, and the interest of the stockholders but secondary, the wilful frustration of that intention by the act of the company is a fraud upon the rights of the public.

2. A corporation guilty of such a fraud cannot appeal to a court of equity to suppress for its own benefit an interference with exclusive privileges, claimed under its charter, by a competition which has arisen from its own neglect of a charter duty.

3. A legislative grant of exclusive privileges to a corporation, is to be construed most strictly, and every intendment not obviously in favor of the grant claimed must be construed against it: Emerson v. Commonwealth, 108 Pa. 111.

4. Clause 3, § 34 of the corporation act of April 29, 1874, P. L. 94, does not extend the exclusive privilege conferred, to companies incorporated under said act for the purpose of furnishing light by electricity to consumers.

5. Monopolies operate in restraint of competition and are detrimental to the public welfare, and are not allowable at all except where the resultant advantage is in favor of the public; as, for instance, when a water or gas company could not exist except as a monopoly: per Mr. Chief Justice GORDON.

6. It seems: The corporation act of April 29, 1874, P. L. 73, providing for the incorporation of companies for " the manufacture and supply of gas, or the supply of light or heat to the public by any other means," does not authorize the incorporation of companies for the supply of electric light to consumers.

Before GORDON, C. J., PAXSON, STERRETT, CLARK and WILLIAMS, JJ.; TRUNKEY and GREEN, JJ., absent.

No 310 January Term 1888, Sup. Ct.; court below, No. 4 October Term 1886, C. P. in equity.

On September 30, 1886, The Scranton Electric Light & Heat Company filed a bill in equity against The Scranton Illuminating, Heat & Power Company, praying for a special injunction, to be made permanent on final hearing, restraining the defendant company from furnishing electric light to the city of Scranton and from interfering with the rights of the plaintiff company; for further and other relief.

On October 18, 1886, a special injunction, issued on the filing of the bill, was dissolved, opinion by HAND, P. J.  The defendant company filed its answer on March 5, 1887, and the cause being put at issue was subsequently referred to *Mr. James H. Torrey*, as examiner and master, who on January 25, 1888, reported as follows:

The complainant's bill filed September 30, 1886, sets forth that it is a corporation duly organized and chartered on May 12, 1883, under the act of April 29, 1874, for the purpose of furnishing light to the city of Scranton and suburbs and to the inhabitants thereof, with a capital of fifty thousand dollars; that in pursuance of said charter, the complainant had purchased land and constructed a plant for the manufacture and furnishing of light by electricity to all the citizens of the city of Scranton and suburbs, who desired to use such light, and had erected poles and placed wires upon the same, and procured costly machinery, and were and had been since June, 1884, engaged in furnishing electric light to all the inhabitants of the city of Scranton and suburbs who desired to purchase and use the same, and were ready and prepared to furnish the different kinds of electric light as the demand for the same might require; that complainant had obtained permission from the municipal authorities of the city of Scranton to occupy the streets and carry on their business within the corporate limits as required by law; that the defendant company had procured a charter for the purpose of furnishing light in the said city of Scranton, were engaged in planting poles and making other preparations for furnishing electric lights to the inhabitants of said city for a consideration in money, and claimed the right

under their charter to do so; that under the act of assembly the complainant had by virtue of their charter the exclusive right to occupy the territory comprising the city of Scranton, and furnish the inhabitants thereof with electric light for and until the said company should have earned and divided dividends of eight per cent on the capital stock for a period of five years, and that they had neither earned nor divided any dividends upon this capital stock; that the defendant, without the right to do so, was interfering with the rights and franchises of the complainant company, inflicting upon it serious harm and damage, and if allowed to proceed would reduce the value of complainant's property and capital, and do them other irreparable damage. The prayers were for a special injunction, to be made permanent on final hearing, restraining the defendant, its servants and agents, from furnishing electric light to the city of Scranton or any of the inhabitants thereof, and from interfering with the vested and exclusive rights of complainant in any manner; and for general relief.

The defendant, by its answer filed March 5, 1887, admits the incorporation of the plaintiff company, and does not deny that it has purchased ground, erected poles and constructed a plant for the purpose of furnishing electric light to the city of Scranton and the inhabitants thereof; it does specifically deny that complainant is provided with machinery and appliances necessary to enable it to furnish other than arc electric light, or that it is in good faith furnishing to the public any kind of electric light. Upon this point it specifically charges that in the summer of 1884, the control of the complainant company passed into the hands of the Scranton Gas & Water Company; that this control was secured for the express purpose of managing the plaintiff company in the interests of the said Gas & Water Company, and that by a system of over-charges and by other means the use of electric lights had been discouraged and the inhabitants of the city of Scranton practically deprived of their use. It is admitted that the defendant had secured a charter, and that it was proceeding thereunder to locate, erect and construct all the necessary machinery, poles, wires and other appliances for the manufacture and supply of electricity for lighting, heating and other purposes within the city of Scranton; it is averred that the defendant company had obtained

permission from the municipal authorities of the said city to occupy and use the streets and carry on its business within the corporate limits thereof; it is specifically denied that the complainant has the exclusive right claimed in its bill, "to occupy the territory comprising the city of Scranton and to furnish the inhabitants thereof with electric light," during the period in said bill averred, (a) because the purposes of the corporations, plaintiff and defendant respectively, are not identical or in conflict with each other; (b) because neither the said act of April 29, 1874, nor any other act, has conferred any exclusive rights, privileges or franchises whatever upon the said corporation plaintiff; (c) because if any act of assembly purports to confer such exclusive privilege, such act is, in that regard, unconstitutional and void. It is further denied that the defendant corporation is in any manner interfering with the rights and privileges of the plaintiff, or inflicting upon them any harm or damage; whereupon the defendant prays to be dismissed with costs.

Upon the filing of the bill a special injunction was granted as prayed for, and at the same time a rule was taken on the defendant to show cause why the injunction should not be continued. By opinion of HAND, P. J., filed October 18, 1886, this rule was discharged and the special injunction dissolved.

The testimony offered by the parties was taken by the undersigned sitting as examiner, September 13, 1887, and on other succeeding days, which was reduced to writing and is filed with this report. The master finds from the testimony as facts pertinent to the issue in this case the following:

1. April 30, 1883, Randolph Crippen and eight others, citizens of the city of Scranton, executed a certificate of incorporation in accordance with the requirements of the act of April 29, 1874, for the formation of a corporation of the second class, to be called The Scranton Electric Light & Heat Company. These articles were duly acknowledged and recorded in the office of the secretary of the commonwealth in Charter Book No. 17, page 296. May 12, 1883, letters patent, under the great seal of the commonwealth, were duly issued incorporating the subscribers to the said certificate under the corporate name aforesaid. This corporation is the plaintiff in this suit.

2. By concurrent resolution of the councils of the city of

Scranton, approved by the mayor June 23, 1883, the plaintiff was granted permisssion " to introduce, locate and erect the electric light plant in the city of Scranton, said lights to be attached to insulated wires; said wires to be erected on poles along streets, avenues and alleys."

3. Between the date of its incorporation and June 1, 1884, the plaintiff company purchased land in said city of Scranton, erected machinery, planted poles, and otherwise prepared themselves to furnish arc electric lights to such subscribers as they could secure in said city.

4. About July 1, 1884, the plaintiff company was in full operation, having obtained subscribers for about sixty-four lights. At this time the entire stock and property of the company had passed into the hands of Mr. W. H. Spang, of Reading. Through Mr. L. N. Kramer, of Scranton, Mr. Spang entered into negotiations for the sale of the plant to Mr. W. W. Scranton. These negotiations were consummated about July 1, 1884, by the purchase of the entire stock, plant and property of the plaintiff corporation (the stock being assigned in blank) for the sum of $20,000, part of which was paid by Mr. Scranton's assumption of certain debts owing by the company, part by the check of the Scranton Gas & Water Company, of which Mr. Scranton was then the president, payable to Mr. Scranton and indorsed by him, and the balance by a note of the Scranton Gas & Water Company, similarly indorsed. Thereafter, up to the present time, the officers and directors of the plaintiff company have been identical with the officers and directors of The Scranton Gas & Water Company, and all its business has been transacted in the office of that company.

5. At the time of this transfer, the plaintiff company were operating one circuit to supply lights until nine or ten o'clock at night, called the ten o'clock circuit, and another to supply lights until midnight, called the twelve o'clock circuit. The ten o'clock circuit was made to accommodate stores, which needed no light after that hour, and the rates charged were proportionally lower. For instance, at the time of the transfer, the rate for two lights on the twelve o'clock circuit was ninety cents per night, on the ten o'clock circuit seventy cents; for three or more lights, on the twelve o'clock circuit

forty cents per light per night, and on the ten o'clock circuit thirty-two and a half cents. In November, 1884, four months after the transfer, the whole system was changed. The ten o'clock circuit was taken off, and all lights were put on the twelve o'clock circuit. The rates were made uniform at a slight advance on the former rates for the twelve o'clock circuit, as follows: A uniform rate of fifty cents per light per night was made for all lights, and discounts were allowed as follows: On one light two per cent, on two lights eight per cent, on three lights ten per cent, on four lights twenty per cent. The effect of this change was to make a very large increase in the rate for those who had been on the ten o'clock circuit, and the following increase on the twelve o'clock circuit:

1 light from 48 cents to 49 cents.
2   "      "    45   "    "  46   "
3   "      "    40   "    "  45   "
4   "    same rate 40 cents.

6. No energetic efforts seem to have been made after the transfer, by the new officers of the plaintiff company, to enlarge or even retain the business of the company. On the contrary, they seem to have stood by and seen the business diminishing until it had almost disappeared, without any sign of anxiety or quickened energy. At the time of the transfer, the company supplied sixty-four lights; about a year later, in August, 1885, only fourteen; in another year, August, 1886, only ten; and at the time the bill in this case was filed, only nineteen.

7. At no time up to the commencement of this suit had the plaintiff company any appliances adequately adapted to the supply of incandescent electric light.

8. The plaintiff company has never earned nor paid any dividends whatever upon its capital stock.

9. April 3, 1886, B. H. Throop and five other citizens of the city of Scranton, executed a certificate of incorporation in accordance with the provisions of the act of April 29, 1874, for the formation of a corporation of the second-class, to be called The Scranton Illuminating, Heat & Power Company. This certificate was duly acknowledged and recorded in the office of the secretary of the commonwealth in Charter Book No. 22,

p. 297.  May 1, 1886, letters patent under the great seal of the commonwealth, were duly issued incorporating the subscribers to the said certificate under the corporate name aforesaid.  This corporation is the defendant in this suit.

10. By concurrent resolution of the councils of the city of Scranton, approved by the mayor June 28, 1886, permission was granted to the defendant company " to erect poles and stretch wires on the same along the said streets and alleys of said city for the proper distribution of electricity for furnishing light."

11. The defendant company immediately proceeded to purchase land, construct and erect machinery, plant poles, string wires thereon, and generally to furnish itself with all means and appliances necessary to enable it to supply both arc and incandescent lights to its patrons in the said city of Scranton. About three weeks after it had begun to plant poles in the streets, September 30, 1886, the proceedings in this case were commenced by the plaintiff company.

12. After the dissolution of the special injunction, the defendant company completed its plant, and has since been in full operation, supplying about 4,000 incandescent and about 100 arc lights to its patrons in said city.

13. There is no evidence that the plaintiff company or its officers ever refused any applications on the part of residents of Scranton for electric lights.

14. The purposes of the corporations, parties in this case, as stated in their certificates of incorporation, were—of the plaintiff, " furnishing light and heat to the city of Scranton and suburbs, and to the inhabitants ; " of the defendant, " manufacturing electricity to supply the same through appropriate conductors in the city of Scranton, Pa., for lighting, heating and power, and supply consumers with necessary appliances to utilize the same."

It is argued by the defendant that the evidence justifies the conclusion that, from the time of the transfer of the plaintiff company to Mr. Scranton, until this suit was instituted, the plaintiff company was managed with the deliberate purpose of discouraging and preventing the use of electric lights in the city of Scranton, in the interest of The Scranton Gas & Water Company.

Master's Report.

There is no direct evidence of any arbitrary taking out of lights previously in use, or of any refusal to supply lights when requested, nor of any clamorous public demand for increase of electric lights.   But however desirous the company might be to prevent the use of their lights, it would hardly be expected that they would seek to attain that end by high-handed measures, which would have been a challenge to the public to seek a forfeiture of their charter.   Their disposition toward the public is rather to be judged of from a consideration of their acts and the results which followed them, under the legal presumption that every one intends that which is the natural consequence of his acts.

When Mr. Scranton took charge of the company they had barely begun business, and had secured subscribers for sixty-four lights.   Within a few months, by change of circuits and increase of rates, a very important advance was made upon the rates of those who only needed the lights till ten o'clock, and a slight advance on nearly all lights.   In a year the number of lights had decreased to fourteen, and seems never again to have reached twenty up to the time this suit was commenced.   In the meantime, a reduction of 20 per cent was made in the price of gas.   No energetic effort was made to increase the use of electric lights, and no machinery was procured to enable the company to furnish incandescent lights at all. Since the establishment of a rival company the plaintiff has entered into a contract with the city for 130 or more arc lights, and have secured subscriptions to 100 or more lights from private individuals.   In addition to this, the defendant company has placed 100 arc and 4000 incandescent lights in this city.   However this great demand has been created, it cannot be denied that it exists, and it is evident that it began to exist from the moment that the plaintiff's exclusive right to supply electric lights to the city of Scranton was successfully challenged.

It is hardly conceivable that capable business men would have continued from year to year to maintain an organization like the plaintiff company, which was not doing enough business to pay running expenses, without any effort to enlarge its business, unless there existed some ulterior motive for keeping such organization alive, without regard to its suc-

cess from a business standpoint. No such motive is suggested in this case, except the supposed exclusiveness of the plaintiff's franchises by the maintenance of which The Scranton Gas & Water Company might expect to be protected from danger of competition in the supply of light to the city of Scranton.

Indeed the existence of this motive is hardly denied. Mr. Hand, the plaintiff's secretary and treasurer, says on cross-examination :

Q. Isn't it a fact known to you that the desire on the part of your company was to continue the use of gas in the city of Scranton, instead of electricity, prior to the organization of the defendant company? A. I couldn't say whether that was particularly their desire.

Q. Did you ever hear any conversation on the subject among your directors? A. I really don't call to mind anything that was said about it one way or the other.

The master finds:

[15. That from July 1, 1884, until the commencement of this suit, the business of the plaintiff company was managed wholly in the interest of The Scranton Gas & Water Company, not with a desire and effort on the part of its management to encourage the use of electric light and to furnish the best and cheapest light practicable, but with the intention as far as practicable to restrict the use of electric light for the benefit of said Gas & Water Company, and depending on the supposed exclusiveness of plaintiff's franchise for protection against competition.] ³

The legal questions involved in the case are identically the same which were argued at the hearing of the rule to continue the preliminary injunction, and which were carefully and thoroughly considered by the court in the opinion discharging that rule. As they arise out of the construction of the act of assembly under which both parties were chartered, no material aid is given to their solution by the testimony taken by the examiner or the facts found therefrom by the master. So far as this court is concerned, they are, therefore, res adjudicata, and the master would require to be very clearly convinced that the court erred in its previous decision before he would disa-

gree with the conclusions reached in the said opinion. So far from being convinced that the court was in error, the master is entirely in accord with the position taken at the preliminary hearing.

The single legal question in the case is this: Has the plaintiff by its charter, and the act of assembly under which it was organized, an exclusive right to supply electric light to the city of Scranton and its inhabitants, until it has paid or earned dividends equal to eight per cent of its capital stock for five years? If it has such exclusive right, it is prima facie entitled to the relief prayed for in the bill. If not, it has no standing in court.

The act of April 29, 1874, is to be construed as a whole. In the second section the purposes for which corporations may be formed under the act, are divided into two classes and each class is subdivided into numerous varieties. Those of the second class are divided into twenty varieties, of which the ninth is "The supply of water to the public," and the eleventh, "The manufacture and supply of gas or the supply of light and heat to the public by any other means." Section 3 prescribes the means by which charters shall be procured, in which it appears that the purposes of the corporation are to be gathered from the certificate which is to be recorded both in the office of the secretary of the commonwealth and in that of the recorder of deeds of the proper county. Sections 4–26 define the general powers and duties of corporations and their officers, the methods of conducting their business, etc. Sections 27–40 prescribe the special powers and duties of the corporations of the second class, formed for the several specific purposes mentioned in section 2. Among the special powers so granted, is the delegation of the right of eminent domain within carefully prescribed limits, to such of the corporations and to such a degree as seemed likely to be required for the prosecution of their intended business. For instance, to road companies, ferry and bridge companies, and water companies, is given the right to take and condemn lands, etc.; to telegraph and water and gas companies is given the right to enter upon and occupy roads, streets or highways, the former for the purpose of erecting poles and stretching wires thereon, the latter for the purpose of laying down, altering or repairing pipes, etc. To many

of the corporations no such powers are given, such, for instance, as insurance companies, building and loan associations, iron and steel companies, etc.

It is in the 34th section that the provisions applicable to the question at issue here are found. Clause 1 of this section specifies the powers of a "company incorporated as a gas company, or company to supply heat or light to the public," among which is " the right to enter upon any public street, lane, alley or highway, for the purpose of laying down pipes, altering, inspecting and repairing the same." Clause 3 is as follows : " The right to have and enjoy the franchises and privileges of such incorporation within the district or locality covered by its charter shall be an exclusive one, and no other company shall be incorporated for that purpose until the said corporation shall have from its earnings realized and divided among its stockholders during five years a dividend equal to eight per centum per annum on its capital stock," etc.

Fortunately the act itself prescribes the rules of construction which are to be adopted in the determination of the powers granted by it. Section 25 is as follows : " The incorporation of any association of persons for the purposes named in this act, or accepting the same shall be held and taken to be of the same force and effect as if the powers and privileges conferred and the duties enjoined, had been conferred and enjoined by special act of the legislature, and the franchises granted shall be construed according to the same rules of law and equity as if it had been created by special charter, and no modification or repeal of this act shall affect any franchise obtained under the provisions of the same."

Naturally the first question to be met is : Does the charter of the defendant necessarily conflict with that of plaintiff? As we have seen, the purposes for which charters are granted under the act are to be gathered from the certificate of incorporation, and clause 3, section 34, provides that "no other company shall be .incorporated for the same purpose until," etc. Under the rules of law applied to such questions, if a special charter had been granted to the plaintiff for the purposes mentioned in its certificate, viz.: for the purpose of "furnishing light and heat to the city of Scranton and to the inhabitants thereof," and such charter contained the exclusive

privilege given by clause 3, would the granting of the defendant's charter for the purposes stated in its certificate, viz.: for "manufacturing electricity to supply the same through appropriate conductors in the city of Scranton, Pa., for lighting, heating and power, and to supply consumers with necessary appliances to utilize the same," would this constitute a violation of such exclusive privilege?

Grants of exclusive privilege or monopolies are to be strictly construed. [It is manifest at a glance that the purposes of these charters are not verbally identical. Are they legally so? We think not.] [4]

The purpose of the defendant company may be included in the general terms used to express the purpose of the plaintiff; but they are not therefore identical. Emerson v. Commonwealth, 108 Pa. 111, presents almost precisely a parallel state of facts. There the purposes expressed in general terms in the certificate of the company first chartered "to supply heat to the public from gas," clearly included the purpose of the second company "to supply heat to the public by means of natural gas," yet the Supreme Court held that the purposes were not identical. Though the proposed sources of supply for gas of the different companies in that case were different, the one being from within and the other from without the city, yet in the decision of the case that consideration was distinctly passed, and it was squarely decided that, independently of it, the purposes were not identical. A further consideration which leads to the same conclusion is that exclusive privileges are granted with an implied obligation to the public co-extensive with the grant. "The grant of state aid to enable a private corporation to accomplish a purpose of public interest is, therefore, always subject to the implied condition that the company shall assume an obligation to the state to fulfill the purposes of the grant. They would have no power to grant the aid of the state on any other terms. It is immaterial whether the aid be in the form of direct donation of funds or property by the state, or by a county or municipality, or in the form of a subscription for shares, or of a delegation of the power of eminent domain, or of an exemption from taxation, or of a monopoly. In each instance the acceptance of a grant of the public aid implies an assumption by the grantee of an

obligation in favor of the public:" Morawetz on Private Corporations, § 1114, 2d ed.

If by its charter the plaintiff was granted the exclusive privilege of supplying light and heat to the city of Scranton, by whatever means, thereby they are under a corresponding obligation to do so. Will it be contended that if a demand should arise (if it does not already exist) for the supply of heat by steam, that the plaintiff must go to the expense of procuring all the necessary machinery and appliances to meet that demand, or else forfeit its charter? Suppose natural gas should be discovered in this region, would the plaintiff be compelled to provide for its supply to the city? Suppose the present considerable number of methods for the distribution of light to many points from a single centre should be indefinitely increased by new discoveries and new inventions, must the plaintiff hold itself ready to adopt every new method of whatever outlay, or violate its implied contract with the state? Yet all these things are as clearly within the scope of the purposes declared by them as is the supply of light by electricity, and if their chartered franchise covers these things, and they have an exclusive right, they may at any moment be forced by a public demand to provide for them.

In this connection the language of the United States Supreme Court in Bridge Proprietors v. Hoboken Co., 1 Wall. 149, seems pertinent: " The building of a bridge was not the privilege but the duty of those who had the (charter) contract; a duty which constituted the consideration for the privilege which was granted to them. The right to collect toll from persons and things passing over their bridges, is the privilege or franchise which they have, and that right is rendered valuable by the prohibition to build other bridges within the limits designated." So, in this case, the supply of light or heat is not the privilege or franchise granted, but it is a duty imposed upon the plaintiff, in consideration of which the corporate franchises are to be granted.

Again, the extent of every grant is to be determined by the common significance which was given to the words used at the time of the grant. See cases cited by counsel in Bridge Proprietors v. Hoboken Co., supra, 133–4. That was a case in which it was attempted to restrain the erection of a railroad

bridge within the limits in which an exclusive charter had been granted to a bridge company. The court held that at the time the original charter was granted, railroads were unknown, and the case of a railroad bridge could not have been contemplated, and was not, therefore, included in the words prohibiting other bridges. Upon this principle it is forcibly argued that the provisions of the act of 1874 were not intended to cover the case of lighting and heating by electricity for the simple reason that such use of electricity was at that time only a matter of scientific experiment and not of general utility; and that the general words " or the supply of light and heat by other means " are properly restricted to such means as were in common use at that time. It matters not that such construction might defeat the charters of both companies. The plaintiff is seeking relief on the claim of an exclusive right and fails equally whether it is found that both parties have an equal right, or that neither has any right. Moreover the supplement of 1876 more distinctly covers this purpose, and there is no hint of exclusive privilege there.

The master therefore finds as law :

[1. That the purposes for which the defendant was chartered, are not the same as those for which the plaintiff was chartered, and therefore that in carrying out its purposes the defendant is not invading the exclusive privilege of the plaintiff.] [5]

Again, as it is clearly stated in the opinion dissolving the preliminary injunction, both parties to this suit desire to furnish light by electricity, and the only public franchise which is necessary for that purpose, viz. : the occupation of streets, etc., for the erection of poles, and the placing of appropriate conductors, not only is not made exclusive, but is not granted at all in the act of 1874, and the public franchises which are granted and made exclusive in section 34 of the act, are such as though very needful for a gas company, are of no use whatever in the supply of electricity, viz. : the " right to enter upon any public street, lane, alley or .highway, for the purpose of laying down pipes, altering, inspecting and repairing the same."

It is unnecessary to add anything to the opinion of the court on this point, and the master finds :

[2. That none of the acts charged and proven to have been committed by the defendant constitute an invasion of any exclusive franchise or privilege granted to the plaintiff by its charter, or the act of 1874.] [6]

The master's fifteenth finding of fact is material to the case only upon the question whether the plaintiff comes into court with clean hands. Bearing in mind that grants of exclusive privilege are only sustained so far as they promote the public good; that they are granted on the implied condition that they shall be so exercised as to benefit the public, and that the thing to be done by the corporation is a duty and not a privilege; it becomes evident that proof of intentional mis-user or non-user, or of any effort or design to make the possession of the exclusive privilege an instrument for the embarrassment or deprivation of the public, will be sufficient to prevent a court of equity from interfering for the protection of such exclusive privilege. In view of these principles and upon the facts found in the case, the master finds:

[3. That the conduct of the plaintiff company, at and before the filing of the bill in this case, was such as to deprive it of the right to call for the interposition of a court of equity, even if it had possessed the exclusive franchises claimed by it.] [7]

[The master, therefore, respectfully recommends that the plaintiff's bill be dismissed at the cost of the plaintiff.] [8]

To this report the plaintiff excepted, that the master erred:
1. In his 15th finding of fact. [3]
2. In his saying as embraced in [ ] [4]
3. In his 1st conclusion of law. [5]
4. In his 2d conclusion of law. [6]
5. In his 3d conclusion of law. [7]
6. In the decree recommended. [8]

These exceptions having been overruled by the master were renewed in court, and on January 26, 1888, the court, HAND, P. J., dismissed them and entered a final decree that the plaintiff's bill stand dismissed, with costs to be paid by the plaintiff. Thereupon the plaintiff company took this appeal and assigned as error:

1, 2. The confirmation of the report and the dismissal of plaintiff's bill.

Arguments.

3–8. The dismissal of plaintiff's exceptions. [3 to 8]

*Mr. W. H. Jessup* for the appellant:

I. Do the exclusive rights given by § 34, act of April 29, 1874, P. L. 93, apply to the plaintiff corporation?

1. There are three classes of corporations referred to in that section: (1) For the supply of water to the public; (2) or, for the manufacture and supply of gas; (3) or, for the supply of light or heat to the public by any other means. The change in the phraseology shows clearly that there were other than gas companies included. The word *or* may be construed *and* when necessary to effect the purposes of the enactment: Diehl v. Perie, 2 Miles 47. The language itself, therefore, and the fair construction of it must be that companies for the supply of light by other means were in the legislative mind: Emerson v. Commonwealth, 108 Pa. 111.

2. Admitted, that the act of 1874 nowhere uses the words *poles* and *wires*, but it does authorize the manufacture of "light from other material," and gives the right to enter upon any public street, lane, alley or highway, for the purpose of laying down *pipes*, altering, inspecting and repairing the same, etc. It may not be considered a very strained definition of a *pipe* to say that it is any longitudinal conduit, of metal or other substance capable of conveying through its length any fluid or substance which may change its position by gravity, pressure or attraction. Laying down does not mean under or even upon the ground.

3. Admitted, the rules which require a corporation asserting a right to a franchise, to point out the section and clause conferring it; that such right must not rest upon any doubtful construction or strained inference, and that it must be the expression of a clear legislative intent. Yet the construction of grants of franchises strictly and most strongly in favor of the public and against the grantee, is subject, however, "to the qualification that the grant must receive a reasonable construction, so as not to defeat the intention of the legislature: Potter, Corporations, § 166 n. 8; Bangor etc. R. Co. v. Harris, 21 Me. 533; Proprietors v. Railroad Co., 104 Mass. 1; N. Y. etc. R. Co. v. Kip, 46 N. Y. 546 (7 Amer. R. 385); Commonwealth v. Railroad Co., 27 Pa. 351. The essential powers of

a corporation may be inferred as well as expressed: Ridge Turnp. Co. v. Stoever, 2 W. & S. 548; Clarke v. Bridge Co., 41 Pa. 157; Linton v. Bridge Co., 1 Gr. 414; Cleveland etc. R. Co. v. Spear, 56 Pa. 335.

4. Every part of a statute should be brought into action in order to collect from the whole one uniform and consistent sense: Holl v. Deshler, 71 Pa. 299; Commonwealth v. Fraim, 16 Pa. 169. Taking the whole statute together, we are led to the inevitable conclusion that the term "companies for the supply of light by any other means" clearly includes those supplying light by electricity. The construction has additional force by referring to the franchise given in the preceding part of the same section, to make, erect and maintain the necessary buildings, machinery and *apparatus* for manufacturing gas, heat or light from coal or other material and distributing the same. The subject must control the meaning of words were there any doubt: Stevens v. Railway Co., 21 N. J. Eq. 261; Doughty v. Railroad Co., 21 N. J. L. 442. Under such a view there can be no doubt that the franchise of "distributing the light therein" and of entering upon the streets for that purpose, is an exclusive one in the plaintiffs, and such an exclusive right may be granted: Lehigh Water Co.'s App., 102 Pa. 515.

II. Do the charters of the plaintiff and defendant corporations so conflict that the franchises of the plaintiff are invaded by the defendant?

The third clause of § 34 says: "The right to have and enjoy the franchises and privileges of such incorporation within the district or locality covered by its charter shall be an exclusive one." Now, clearly "the franchises and privileges of such incorporation" are "to furnish light" by distribution in the streets. This means any and every kind of light, including electric light. The defendant's "purpose" is, to manufacture electricity and supply the same for lighting. Ours to supply light. It is replied, if your charter covers every kind of light, then you owe a duty to furnish every kind to the public, whenever there is a demand for it, and if you do not, you cannot complain if your charter should be forfeited. But attention is called to the latest case on the subject: Douglass's App., 118 Pa. 65.

III. Is the plaintiff corporation estopped by any acts proven in this case from seeking relief in a court of equity?

This brings up the consideration of the fifteenth finding of fact and the third conclusion of law therefrom, that the conduct of the plaintiff was such as to deprive it of the right to call for the interposition of a court of equity, even if it possessed the exclusive franchises claimed by it. From the testimony [quoted and reviewed] we think the master in these findings and the court in approving them committed serious error.

*Mr. Robert Snodgrass* (with him *Mr. Edward N. Willard* and *Mr. Everett Warren*), for the appellee:

I. Electric light companies are not within the provisions of clause 3, § 34, act of April 29, 1874.

1. While corporations for the supply of light or heat by means other than gas, may be created under subdivision XI., of corporations for profit, as provided in § 2 of the act, it is a mistake to suppose that the charters of those for the supply of light by means of electricity, rest exclusively upon this section, so as to bring them within the purview of § 34. In fact the act of 1874 nowhere provides for the franchises necessary and appropriate to such corporations. The companies having exclusive privileges by clause 3, § 34, are those described in clause 1, and given authority "to supply with gas light," not light generally, and to manufacture "gas, heat or light from coal or other material," and to lay down pipes, etc., upon condition that they "shall at all times furnish pure gas." An electric light company does not furnish gas light; nor does it in any proper sense manufacture heat or light, or lay down pipes in streets for distribution. The new definition of *pipe* will not induce a violation of one of the simplest rules of statutory construction, to wit, that the words of a statute, if of common use, are to be taken in their natural, plain, obvious and ordinary signification: Phil. etc. R. Co. v. Railroad Co., 53 Pa. 60.

2. The first legislative recognition of electricity as an agent applicable to useful purposes is in the supplementary act of May 1, 1876, P. L. 90, and it is under the fourth section of this act that the defendant company claims to have acquired

the right to erect poles and string wires in the public streets. The authorized permission of that section " to erect ·poles or run wires on the same over or under any of the streets, lanes or alleys of said city, town or borough," is equivalent to a legislative declaration that laying down pipes and erecting poles and running wires in public streets, are two separate and distinct franchises. Subsequent legislation sustains this interpretation. By the ·act of June 10, 1881, P. L. 112, the provision that all companies given exclusive privileges conditioned upon furnishing " at all times pure gas," is extended to all gas companies incorporated under any of the laws of this commonwealth. The act of June 2, 1887, P. L. 311, goes even further in the same direction. In the face of such proof drawn from the legislative mind itself, how can it be that the legislature of 1874, when electricity for lighting·purposes was practically unknown and a thing of the laboratory only, intended to confer an exclusive grant of franchises which could not then even be defined ?

II. The purposes of the two corporations are identical within the meaning of the act of 1874.

Observe, we are not to look at the name of a corporation to determine its purpose: Central Pa. Tel. & Sup. Co. v. Thompson, 112 Pa. 118. The declared purpose of plaintiff corporation is " furnishing light and heat to the city of Scranton," etc. By what means, is not declared. Whatever right, however, the corporation possesses, must rest exclusively upon the act of 1874 ; it can claim nothing from the act of 1876, for there is no purpose declared " for the transaction of any business in which electricity may be applied to any useful purpose." Now, the declared purpose of the defendant corporation is the " manufacturing electricity, to supply the same through appropriate conductors in the city of Scranton, Pa., for lighting, heating and power, and to supply customers with necessary appliances to use the same." Here the purpose is distinctly stated to be the supply of light, etc., by means of electricity, thus bringing the defendant corporation expressly within the class provided for by the act of 1876 ; so that its charter rests upon both the act of 1874 and the act of 1876, whilst that of the plaintiff depends exclusively upon the act of 1874. Outside of this consideration, however, the difference in the purposes of these corporations is substantially if not precisely the

same as that passed upon by this court in Emerson v. Commonwealth, 108 Pa. 111.

III. The plaintiff company, at the time the bill in this case was filed, was not exercising in good faith its franchise to supply light by means of electricity, if it had such franchise.

An examination of the whole testimony will amply justify the master's findings. This testimony we do not propose to repeat, but certain facts lie upon the surface which the plaintiff does not and cannot dispute. They are:

(*a*) That the entire stock, plant, etc., of the plaintiff company had been transferred to the Scranton Gas & Water Company in 1884.

(*b*) That immediately thereafter the number of arc lights furnished by the company decreased from 64 on July 1, 1884, to 12 at the time defendant company was incorporated, and remained at about that number for nearly a year and a half and until this bill was filed.

(*c*) That after such transfer the price of arc lights was materially increased, certain circuits taken off and the business run so as to discourage the use of electric lights.

(*d*) That at the time of filing the bill in this case, the plaintiff company did not have, and never had, any machinery or appliances for furnishing incandescent lights and there was a large demand for said lights.

OPINION, MR. CHIEF JUSTICE GORDON:

The Scranton Electric Light & Heat Company which, in the case in hand, seeks to restrain the defendant from furnishing electric light to the citizens of Scranton, was chartered on May 20, 1884, under the act of April 29, 1874, " for the purpose of furnishing light and heat to the city of Scranton and suburbs, and the inhabitants thereof." Soon after the organization of this company the stock thereof was purchased by the president of the Gas & Water Company, in order, as the counsel for the appellant alleges, that " the two companies might work in harmony, and furnish all the facilities demanded by the public for light without that ruinous competition which might prove disastrous to both." In other words, the gas company effectually anticipated and prevented a competition that might have proved highly beneficial to the community, by securing the stock of its rival.

Of course, if this were done for a legitimate purpose, and that purpose had been faithfully carried out, no serious objection could be taken to it.   But unfortunately for the plaintiff's case, the master has found that neither in design nor execution was that purpose originated or carried out for the welfare of any one but the company.   He finds, " that from the first of July, 1884, until the commencement of this suit, the business of the company was managed wholly in the interest of the Scranton Gas & Water Company, not with a desire and effort on part of its management to encourage the use of electric light, and to furnish the best and cheapest light practicable, but with the intention, as far as practicable, to restrict the use of electric light for the benefit of the said Gas & Water Company, and depending upon the supposed exclusiveness of the plaintiff's franchise for protection against competition."   This finding is sustained not only by the oral testimony but by the results.   When W. W. Scranton, the president of the Gas & Water Company, took charge of the Electric Company, it had already secured subscriptions for sixty-four arc lights, but within a year thereafter the number of those lights was reduced to fourteen, and up to the time of the establishment of the new company, that number was never increased so much as to exceed twenty.   This result seems to have been occasioned by a change in the method of furnishing the electricity which produced an increase of cost, and also by a reduction in the price of gas.   This latter result being beneficial to consumers, not only could not be complained of, but prima facie might be regarded as the cause of the falling off of the demand for electric lights.   This explanation appears, however, from subsequent events, to be fallacious; for, since the establishment of the competing company, the plaintiff has secured contracts for 230 arc lights, and the defendant has placed 100 lights of the same character, together with 4000 incandescent lights.   It is thus obvious, that by the operations of the plaintiff, the citizens of Scranton were purposely deprived of a valuable source of illumination without any corresponding benefit.

Now, the primary object of the institution of a corporation is the public welfare, and the interest of the stockholders is but secondary; hence the wilful frustration of that intention by the act of a company is a fraud on the public, and the corporation

perpetrating it is entitled to no equitable consideration. According to the finding of the master, of this kind of fraud the complainant has been clearly guilty; it has become the mere instrument in the hands of the Gas & Water Company to deprive by a false pretence, the city and citizens of Scranton of a very useful, if not absolutely necessary commodity. How then can it stand in a court of equity? It is to no purpose to say that its charter cannot be attacked in this collateral proceeding. No one is attacking its charter, but it cannot interpose that charter as a cover for its own fraud. It has appealed to the equitable side of the court to suppress, for its own benefit, a competition that has arisen from its neglect of a charter duty, and without touching upon its legal rights or legal remedies, this, we think, cannot be done. Chancery deals only with conscionable demands, and with those that are unconscionable, whether through fraud or mere neglect, it will have nothing to do. Therefore, without further comment, we might affirm the decree of the Common Pleas, but as there is another important question involved in the case, we cannot properly pass it without comment.

Under the third clause of the 34th section of the act of 1874, the plaintiff claims the exclusive right to furnish the city of Scranton and its inhabitants with electric lights. This claim may be regarded as sound, if in fact the said section does include electric lighting, but not otherwise. Did the legislature intend to embrace electric lighting in the language, "companies incorporated under the provisions of this statute, for the supply of water to the public, or for the manufacture of gas, or the supply of light or heat to the public by *any other means.*" Before answering this question we must call attention to what has heretofore been regarded as an unalterable rule; that is, that a legislative grant to a corporation of exclusive privileges is, as said by Mr. Justice GREEN, in Emerson v. The Commonwealth, 108 Pa. 111, to be construed most strictly, and we may add, that every intendment not obviously in favor of the grant must be construed against it. Monopolies are favorites neither with courts nor people. They operate in restraint of competition, and are hence, as a rule, detrimental to the public welfare; nor are they at all allowable except where the resultant advantage is in favor of the public, as, for instance, where a water or gas company could not exist except as a monopoly. Applying then

the rule here stated to the case in hand, and we cannot pronounce the conclusion of the master and court below to be erroneous.

In the case above cited the sharpest technicality of construction was adopted in order to defeat the extravagant demand of the corporation claiming the exclusive privilege to furnish the city of Pittsburgh with natural gas for the purposes of fuel.　But in the case before us it is apparent that the legislature did not, in the making of the act of 1874, intend to embrace lighting by electricity.　It is true, that the language of this statute seems, at first sight, to be broad enough to embrace all methods of lighting and heating then known, or that might thereafter become known, yet, we suppose, it will not be contended that the intention was to grant to this company the exclusive privilege of furnishing to the citizens of Scranton coal, wood, oil, and other well known and ordinary materials for lighting and heating.　Not indeed, that the law-makers could not have conferred such power, but because it is not probable that they intended to confer a power so unreasonable.　It is, therefore, obvious that we must consult not only the letter of the act, but also the intention of its makers.　If, however, it were designed to embrace a method of lighting by electricity, a method not then in use for economic purposes, it is remarkable that the means necessary for its proper distribution were not provided for.　Under the 34th section of the act, the only one upon which the plaintiff relies for its exclusive right, there is no power conferred to enter upon the public streets for the erection of poles and placing of wires, the privilege of so entering being confined to the laying of pipes only.　From this it is clear that the legislature had in mind, not a then unknown process of public lighting and heating, but a process involving the use of gas, or some similar material, for the distribution of which pipes only were necessary. Having thus ascertained the intention of the law-making power at the time of the passage of the act of 1874, we cannot agree to extend the franchise of the plaintiff by construction, but are willing rather to concur in the decree of the court below, because the right so claimed, not only may be, but has proved to be detrimental to the public welfare.

　　　　　　　　The decree of the court below is now affirmed at costs of appellant.