## BIENVILLE WATER SUPPLY COMPANY *v.* MOBILE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ALABAMA.

No. 126. Argued January 22, 23, 1902.—Decided June 2, 1902.

The plaintiff took its charter with notice that it was not given the exclusive right of supplying the city of Mobile with water, and it had not, at the time of the transactions referred to in the pleadings, obtained that which its charter before amendment purported to authorize it to obtain, to wit, an exclusive right to all the sources of supply in the county.

The legislature had the right of revocation and amendment.

On February 21, 1899, the appellant, as complainant, filed its bill in the Circuit Court of the United States for the Southern District of Alabama to restrain the city of Mobile from building or operating prior to July 1, 1908, or before the city should have purchased the waterworks of the complainant, any system of waterworks connected with or having for its source of supply any stream of water in Mobile County. Upon answer and proofs the Circuit Court entered a decree dismissing the bill, whereupon an appeal was taken directly to this court.

The facts are these : In 1840 the city of Mobile made a contract with Albert Stein, which was ratified by an act of the legislature of the State, January 7, 1841. By this contract Stein received the exclusive right to supply the city with water from a stream called Three Mile Creek, and the city the right to purchase his plant at a price to be fixed by arbitration. Stein constructed his plant, and it was for many years the sole source of supply. But it was not satisfactory, and hence the charter to the appellant. This charter was granted by two statutes, dated respectively February 19, 1883, and February 14, 1885. By these statutes the company was given all the rights vested by contract or law in the city to purchase the Stein franchise and plant, and for that purpose was to be considered the assignee of the city ; also generally the right to acquire by contract with the owners any franchise and plant for supplying Mobile with water, and in case of disagreement with the owners as to price, the right to condemn and take the said franchise and plant under the State's right of eminent domain. It was given for twenty years, and until a purchase of its plant by the city the exclusive right to supply the city with water from any source in the county of Mobile, other than Three Mile Creek, (the Stein source of supply,) and when it should acquire the Stein franchise the exclusive right from that creek also, subject to this proviso :

" But nothing in this act shall be construed to prohibit the organization hereafter of any company for the purpose of supplying the city of Mobile or any other place with water which does not interfere with the property rights or rights of obtaining water pertaining to this company."

It was required to begin its work within four years and to supply water within six years. It was also required to supply water at a cost to the consumers, not exceeding certain maximum rates fixed by the act, and to put fire plugs on any square at the request of the owners of three fourths of the improved property thereon. After twenty years the city was given the right to purchase the plant of the company at a price to be fixed by arbitration

The owners of the Stein franchise endeavored by litigation to prevent the erection of the appellant's plant, but a decree in

favor of the Bienville company was affirmed by this court. 141 U. S. 67.

Appellant constructed its plant and supplied the city of Mobile with water under contracts, the last of which would not have expired until July 1, 1900.

By an act of February 23, 1899, (Local Acts, Ala. 1898–99, p. 1689,) its charter was amended by striking out the word "exclusive," thus leaving a grant, but not an exclusive grant.

By an act of February 6, 1897, a new charter was granted to the city of Mobile, and by its terms express authority was given to the city to build or acquire public works, subject to the approval of its citizens by a majority vote. On August 2, 1897, there was submitted to vote and approved by a majority of citizens a proposition that the city should purchase, build or otherwise acquire a system of waterworks to cost not exceeding $500,000 and a system of sewerage to cost not exceeding $250,000, to be paid for by bonds secured by a mortgage upon said public works.

By other statutes the city was given power to issue bonds secured by a mortgage on any plant which it should buy or construct; also power to acquire or condemn any property and the water of any stream in Mobile County excepting only Clear Creek, the source of appellant's supply of water; and, third, to condemn all interest, legal or equitable, not owned by the city in the Stein plant.

Nothing had been done by the appellant under the right given it to purchase or condemn the Stein franchise and property, although its treasurer had in its behalf purchased interests in such franchise and property amounting to 54 28–100 per cent of the full value thereof. On February 18, 1898, the city council passed a resolution to purchase the Stein franchise and property. An arbitration was held, and on its report the city took possession of the property and filed a bill against the treasurer of the appellant to compel him to carry out the arbitration and purchase. The Circuit Court, however, held the arbitration illegal, and dismissed the bill.

On February 21, 1899, appellant brought in the Circuit Court of the United States a suit in equity against the city. In

the bill was set forth the contracts of appellant with the city, and it was contended that there was an implied agreement by the latter not to enter into competition. This suit was dismissed by the Circuit Court, and its decree was affirmed by this court. 175 U. S. 109. The present bill, filed on the same date, is based on the rights given to the appellant by its charter, and it is contended that any legislation authorizing the city to violate such charter rights is in conflict with that clause in the first paragraph of section 10 of article I of the Federal Constitution, which prohibits a State from passing any law impairing the obligations of contracts. -

The constitution of Alabama (1875), which was in force at the time of the transactions herein referred to, contained these several provisions:

"Article I, section 23: That no *ex post facto* law, or any law impairing the obligation of contracts, or making any irrevocable grants of special privileges or immunities, shall be passed by the general assembly."

"Article XIV, section 1: Corporations may be formed under general laws, but shall not be created by special act, except for municipal, manufacturing, mining, immigration, industrial and educational purposes, or for constructing canals, or improving navigable rivers and harbors of this State, and in cases where, in the judgment of the general assembly, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered, amended or repealed."

"Article XIV, section 2: All existing charters or grants of special or exclusive privileges, under which a *bona fide* organization shall not have taken place and business been commenced in good faith, at the time of the ratification of this constitution, shall thereafter have no validity."

"Article XIV, section 10: The general assembly shall have the power to alter, revoke or amend any charter of incorporation now existing and revocable at the ratification of this constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of the State; in such manner, however, that no injustice shall be done to the

corporators. No law hereafter enacted shall create, renew or extend the charter of more than one corporation."

*Mr. Frank P. Prichard, Mr. D. P. Bestor* and *Mr. John G. Johnson* for appellant.

*Mr. B. B. Boone* for appellees. *Mr. E. L. Russell* was on his brief.

Mr. Justice Brewer delivered the opinion of the court.

There is such a similarity between the two suits commenced by plaintiff on February 21, 1899, as suggests a question whether the decision of the one should not be conclusive as to the disposition of the other. The parties were the same. In each the plaintiff set forth its charter and its contracts with the city, and each prayed a decree restraining the city from building or operating any system of waterworks for supplying the city. It is true the bill in the first case counted specially on the contracts made between the plaintiff and the city, and sought a restraint of the city only during the life of those contracts, while the bill in this case sets up more at large the charter rights of the plaintiff as given by the statutes of the State, contends that those rights are infringed by the subsequent legislation of the State and the action of the city thereunder, and seeks to restrain the city during the twenty years named in the plaintiff's charter and until the city shall buy the plaintiff's plant. But each of these seeks to restrain the city from the time of filing the bill. All the rights which the plaintiff had by virtue of its charter and all the violations of such rights caused by the legislation of the State and the action of the city existed at the time of the filing of the bills and during the lifetime of the contracts with the city, and could have been presented in the first suit and been among the matters to be considered in determining whether the plaintiff was entitled to the injunction sought. If the plaintiff was not entitled to an injunction during the lifetime of the contracts with the city it is not entitled to any similar relief after the expiration of those contracts. In other words, the plaintiff failed to set up in the first suit all its

grounds of relief.  Can it be permitted in this to set up additional grounds and obtain the very relief sought in the prior suit as well as additional relief, the same in kind though longer in duration?  Will the law permit the splitting up into separate suits of different grounds for the same relief?  Will not the judgment or decree in the first be held a final adjudication of the rights of the parties?  It appears that the decree in the other suit was rendered in the circuit and affirmed in this court about seven months before the decision of the present case in the Circuit Court.  As against this it may be said that the decree in the other suit was neither pleaded nor proved, and no question of *res judicata* can be considered unless the earlier decision is formally presented on the hearing of the later case. This, doubtless, is technically true, but we take judicial notice of our own records, and, if not *res judicata*, we may, on the principle of *stare decisis*, rightfully examine and consider the decision in the former case as affecting the consideration of this.

But, passing this matter, and leaving out of consideration the special contracts directly between the plaintiff and the city, let us inquire whether any contract rights given to plaintiff by its charter have been violated by subsequent legislation of the State, and the action of the city under such legislation.  Plaintiff contends that under its charter, as created by the acts of 1883 and 1885, it acquired the exclusive right to supply the city of Mobile with water from any stream in the county of Mobile, except Three Mile Creek, and the right to purchase or condemn the Stein franchise and plant for supplying the city with water from Three Mile Creek; that by the later legislation such exclusive right was in terms taken away, authority given to the city of Mobile to build waterworks and supply the city with water therefrom, and that the city had taken possession of the Stein plant, was operating that and was building a system of waterworks of its own, and that thereby its contract right was impaired in violation of the prohibition of the Federal Constitution.

It becomes therefore necessary to see not only the extent of the rights conferred upon plaintiff, but also under what consti-

tutional conditions it received its grant, and what power was reserved to the State to modify the terms thereof. In the first place, the plaintiff did not receive the exclusive right to supply Mobile with water. The proviso in the charter reserved to the State the power to charter other companies for such purpose. Obviously the legislature contemplated the fact that in the future other sources of supply and other companies might be necessary in order to furnish an adequate supply for the growing city, and reserved to itself the right to make such provision as it should deem expedient therefor. It is true the companies which might be chartered were not to "interfere with the property rights or the rights of obtaining water pertaining" to the plaintiff. But manifestly "property rights" refer to rights in respect to tangible property, and thus construed the proviso forbade any interference by any new company with the plant of the plaintiff. In addition, it also forbade interference with the "rights of obtaining water pertaining" to the plaintiff. The plaintiff had not at the time of these transactions obtained the Stein franchise for obtaining water from Three Mile Creek, and could only claim an exclusive right of obtaining water from other sources of supply within the county of Mobile.

The plaintiff, therefore, took its charter with notice that it was not given the exclusive right of supplying the city of Mobile with water, and it had not, at the time of these transactions, obtained that which its charter before amendment purported to authorize it to obtain, to wit, an exclusive right to all the sources of supply within the county. In reference to this the Supreme Court of Alabama, in an opinion filed on June 11, 1901, *City of Mobile* v. *Bienville Water Supply Co.*, 30 Sou. Rep. 445, 446, and since the decree in the Circuit Court, used this language:

"It cannot be pretended that, in granting a charter to the complainant company in 1883, the legislature conferred on that company any exclusive privilege for supplying the city of Mobile and its inhabitants with water. All rights not exclusively granted to the complainant were reserved, and the rights thus reserved included the granting of a franchise to another corporation to carry on the same business in the same territory.

While the effect of granting such a franchise, afterwards, to the city, might be to impair and possibly by fair competition to ultimately largely destroy the value of complainant's plant, it would not.be in excess of legislative power to grant the franchise to the city, nor would it in anywise infringe the Federal Constitution, prohibiting a state legislature from passing laws impairing its obligations. If there is no contract, there is nothing in the grant on which the Constitution could act. The element of a contract by the State with the complainant company did not enter into the grant of its franchise to establish and operate a system of waterworks in Mobile. *Stone* v. *Mississippi*, 101 U. S. 814; *Skaneateles Waterworks Co.* v. *Village of Skaneateles*, 161 N. Y. 154; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420 ; *State* v. *City of Hamilton*, 47 Ohio St. 52; *Scranton Electric Light & Heat Co.'s Appeal*, 122 Pa. 154; 2 Beach, Priv. Corp. secs. 22, 27."

By article I, section 23, of the constitution of Alabama the legislature is prohibited from "making any irrevocable grants of special privileges or immunities."

The significance of this provision was considered by the Supreme Court of Alabama in *Birmingham & Pratt Mines Street Railway Company* v. *Birmingham Street Railway Company*, 79 Ala. 465, in which case it appeared that the city of Birmingham had given what was in terms an exclusive right to the plaintiff to construct a street railway along certain streets, and afterwards had given to the defendant the right to occupy the same streets with a railway. Considering the first grant by the city, the Supreme Court said : " If the power to grant such a franchise resided in this municipality . . . there can be no doubt either of the jurisdiction or of the duty of a court of equity to protect the invasion of the right. . . . If, however, the power in question did not exist, then the grant would be void, so far as it purports to be exclusive in its nature ;" and it was held that the city authorities had no power to grant the exclusive right claimed by the plaintiff. In the discussion of the question the court further used this language :

" What, it may be asked, is the nature of these special or exclusive privileges, which are thus prohibited to be granted by

the legislature ?   It seems plain from the very terms used that the evil intended to 'be especially prevented was the granting of exclusive privileges in the nature of a monopoly by the leg- islative creation of corporate franchises.. Monopolies were void at the common law and are not commonly conferred by legis- lative grant, and need no special prohibition in the organic law of a free republic.'

\*    \*    \*    \*    \*    \*    \*    \*

" The policy of the law, as now declared by our Constitution, is as clear in the condemnation of the grant of irrevocable ex- clusive privileges conferred by franchise, as that of the common law was in the reprobation of pure monopolies which were al- ways deemed odious, not only as being in contravention of com- mon right, but as founded in the destruction of trade by the extinguishment of a free and healthy competition.   *The Case of The Monopolies*, 11 Rep. 84.

" The exclusive right of the appellee to the privilege claimed, in our opinion, cannot be sustained.   The general assembly would itself have no power under the constitution to make such a grant."

It is true that this case was not decided until the December term, 1885, which was after the passage of the last of the two statutes granting the charter to the appellant, and it is also true that in considering questions of an alleged state infringement of a contract we are not concluded by the exposition by the courts of the State of the terms of the contract or the effect of the leg- islation.   At the same time, the opinion of the highest court of the State, even in contract cases, is entitled to most respect- ful consideration, and should not lightly be ignored.

It is contended by the appellant that section 23 of article I must be considered as qualified by section 10 of article XIV, the section which gives the general assembly power to alter, amend or revoke a charter " whenever, in their opinion, it may be injurious to the citizens of the State; in such manner, how- ever, that no injustice shall be done to the corporators."   It is said that while under this provision the judgment of the gen- eral assembly upon the question whether the charter is injurious to the citizens of the State may not be subject to judicial exam-

ination, yet whether injustice has been done to the corporators is in the very nature of things a judicial question, and one which no action of the legislature can preclude the courts from considering. As a corollary from this it is argued that if in the opinion of the courts the attempted revocation works injustice to the corporators it will be adjudged an invalid exercise of legislative power. This section is a new one in this court. It is found in the constitutions of more than one State and has been reviewed in some state courts. So far as they have expressed themselves the expressions have been in favor of the right of a judicial review. *Wagner Institute* v. *Philadelphia*, 132 Penn. St. 612, is cited by the appellee, but that case simply holds that whether the charter is injurious to the citizens is a question of legislative determination. Further than that the opinion does not go. *Leep* v. *Railway Company*, 58 Ark. 407, is also cited. In that case a statute which in effect amended railroad charters was sustained. In the opinion the propriety of the amendment was discussed, a limitation to its scope declared, and in reference to a possible construction thereof the court observed (p. 436):

"An amendment to that extent would be, manifestly, unjust to the companies, and violative of the constitution, which, while it grants the right to amend when in the opinion of the legislature the charter is injurious to the citizens, limits the right to do so to amendments that are just to the corporators."

Subsequently, in *St. Louis, Iron Mountain & Southern Railway Company* v. *Paul*, 64 Ark. 83, another section of the same statute was presented and sustained, *Leep* v. *Railway Company* being cited with approval. This case was brought to this court on error and affirmed. 173 U. S. 404. In *Macon &c. Railroad Company* v. *Gibson*, 85 Ga. 1, the application of a similar constitutional provision was considered, and upon it the court observed (p. 16):

"No constitutional principles are infringed by exercising a reserved power to revoke special privileges or immunities, unless the provision of our own constitution is violated, which forbids doing it in such manner as to work injustice to the corporators or creditors of the corporation. Whether the mode adopted

by the legislature in a given instance is just in this respect or not, whilst primarily a legislative question, may, if palpably decided wrong, become a judicial question."

It does not appear that the Supreme Court of Alabama has passed upon this specific question. We do not think it necessary to determine absolutely the precise meaning of this section or the limits of judicial inquiry under it. It may be simply declaratory, for courts have often held that it was beyond the power of the legislature, under the guise of an act amending or repealing a charter, to take away the property of the corporation. Clearly, the question is, in the first instance, presented for the consideration of the legislature, and a presumption of validity attends its action.

Obviously, from the several constitutional provisions which are quoted in the statement of facts, it was intended that the legislature should have the right of revocation and amendment, and that whoever took a charter should take it subject to that right. To what could such revocation or amendment extend? The possible rights of a corporation group themselves into three classes: First, the right to the tangible property which it may acquire; second, the right to do the specific things which are named in the charter; and, third, the right to exclude others from doing like things. It has been held that the right of revocation or amendment carries with it no right to appropriate the tangible property belonging to the corporation. As said by Chief Justice Waite, speaking of the power of amendment, in *Sinking Fund Cases*, 99 U. S. 700, 720: "All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made." Nothing of this nature was, however, attempted by this legislation. The plaintiff was left in undisturbed possession of its tangible property. So we need not stop to consider what protection could be afforded if the attempt had been made to take away its property.

The second class includes the power of action granted to the corporation; in other words, the right to use the tangible property for the purposes of the charter. But none of these powers were taken away from the plaintiff. It was left free to use

its plant in supplying the citizens of Mobile with water, and to charge and collect pay for its services. Hence no inquiry is pertinent in respect to the limitations, if any there be, on the right of the legislature to take away such powers.

The remaining class is of those rights which flow from exclusive provisions in the charter—the right to prevent others from doing the same things. It cannot be doubted that such a right is valuable; that, for instance, it would be worth something to the plaintiff to have not only the right of supplying Mobile with water, but also the right to exclude others, and thus prevent all competition. That which gives to a government patent for an invention its chief value is not the right to manufacture and sell the thing invented, but the right to exclude others from so doing—the monopoly for the prescribed term of years. But the grant of a monopoly is forbidden by the Alabama constitution. As said by its Supreme Court, in the quotation just made: "The general assembly would itself have no power under the constitution to make such a grant."

By a separate section of the constitution it is affirmatively declared that the legislature shall pass no act " making an irrevocable grant of special privileges or immunities." While that body may grant special privileges and immunities, grant franchises to build waterworks, construct railways, or other works of public utility, and by a failure to duplicate a grant make it in effect for the time being exclusive, yet no one legislature can forestall action by a succeeding legislature or bind the State by making the grant in terms exclusive. As much force and effect must be given to section 23 as to any other, and it was obviously the intent that even if exclusive privileges were granted, the monopoly feature thereof should always be subject to revocation. In this section there is no suggestion of amendment or alteration. That which is distinctly provided is the absolute power of revocation. To hold that the exclusive feature of plaintiff's grant could not be revoked because thereby injustice might be done to the corporators, is simply to nullify section 23.

For these reasons we are of the opinion that the decree of the Circuit Court was right, and it is

*Affirmed.*