CUMBERLAND GASLIGHT CO. v. WEST VIRGINIA & MARYLAND GAS CO.

(Circuit Court of Appeals, Fourth Circuit.    May 4, 1911.)

No. 1,018.

1. STATUTES (§ 238*)—CONSTRUCTION—LEGISLATIVE GRANTS.

Legislative acts granting franchises to private corporations are to be construed strictly, and the grantees take nothing by implication either as against the power making the grant or as against other corporations or individuals.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 319; Dec. Dig. § 238.*]

2. GAS (§ 7*)—GAS COMPANIES—RIGHTS IN STREETS—COMPETING COMPANIES —NATURAL AND MANUFACTURED GAS.

Natural gas is not a competitor of manufactured gas in such strict legal sense that a corporation having an exclusive franchise to use the streets and ways of a city for its pipes for conveying manufactured gas for lighting purposes only may exclude another company from the right to use such streets and ways, with the municipal consent, for pipes to convey natural gas for both fuel and lighting purposes.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 2; Dec. Dig. § 7.*]

3. EVIDENCE (§ 80*)—PRESUMPTION—FOREIGN CORPORATIONS—RIGHT TO DO BUSINESS IN OTHER STATES.

In the absence of legislation on the subject, it is presumed, under the rule of comity, that the law of a state permits corporations of other states to conduct therein the business for which they were chartered if such business is not in conflict with its laws or public policy, and affords them the equal protection of its laws with domestic corporations.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 101; Dec. Dig. § 80;* Common Law, Cent. Dig. §§ 14–16.

Foreign corporations doing business in state, see notes to Wagner v. J. & G. Meakin, 33 C. C. A. 585; Ammons v. Brunswick-Balke-Collender Co., 72 C. C. A. 622.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. GAS (§ 7\*)—FOREIGN CORPORATIONS—RIGHT TO QUESTION POWERS.**

Under section 93 of the general incorporation law of Maryland (Laws 1868, c. 471), as amended by Act April 7, 1876 (Laws 1876, c. 349), which authorizes any gaslight corporation organized thereunder to furnish gas in any city or town for the lighting of streets or public or private buildings and to lay pipes in the streets and ways with the consent of the municipality, an ordinance of a city having general power to legislate for the general welfare and for providing proper and suitable lights for the streets, etc., granting the right to a foreign corporation to lay pipes in its streets to supply the city and its inhabitants with natural gas for fuel and lighting purposes, is not subject to attack by another gas company having a franchise to use such streets; that being a matter for the state alone.

[Ed. Note.—For other cases, see Gas, Dec. Dig. § 7.\*]

**5. CONSTITUTIONAL LAW (§ 207\*)—"CITIZEN."**

A foreign corporation is not a "citizen" within the meaning of article 4, § 2, Const. U. S. entitling them "to all privileges and immunities" as such "in the several states."

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 634; Dec. Dig. § 207.\*

For other definitions, see Words and Phrases, vol. 2, pp. 1164–1174; vol. 8, pp. 7602, 7603.

Status of foreign corporations, see note to Republican Mountain Silver Mines v. Brown, 7 C. C. A. 419.]

Goff, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Maryland, at Baltimore.

Action at law by the Cumberland Gaslight Company against the West Virginia & Maryland Gas Company. Judgment for defendant, and plaintiff brings error. Affirmed.

For opinion below, see 182 Fed. 667.

The plaintiff in error filed its original and amended declaration in the Circuit Court of the United States for the District of Maryland, alleging itself to have been incorporated by a special act of the Legislature of Maryland, whereby it was fully and legally empowered to lay gas pipes in and along any of the streets, lanes, or alleys of the city of Cumberland, and to sell and distribute gas to this city and its inhabitants provided the mayor and city council should assent thereto; that the mayor and city council did assent thereto; that, under and by virtue of said act of assembly and the said assent of the mayor and city council, it became and was and is now vested with the exclusive franchise and right to lay pipes for the transmission and distribution of gas in said city, and no other person or corporation under the laws of Maryland has such right; that it has exercised such right since its incorporation. engaged thereby in the distribution and sale of its manufactured gas to the city of Cumberland and its inhabitants for heating, lighting, cooking, and other purposes; and that said franchise was a valuable one and a source of annual profit to it. It is further alleged that the defendant in error is a West Virginia corporation, engaged in business in Maryland, and in the city of Cumberland, to wit, the business of distributing and selling natural gas to the inhabitants of said city; that it was its duty to refrain from laying pipes, for the distribution and sale of gas, in the streets, lanes, and alleys of Cumberland, which duty it has disregarded, and without legal authority has dug up certain of said streets, lanes, and alleys and laid pipes therein for the distribution of natural gas and has engaged in the business of distributing natural gas through such pipes to the city of Cumberland and its inhabitants for lighting, heating, cooking, and other purposes, thereby caus-

---

ing plaintiff in error a great loss of customers, and to its damage $100,000. A demurrer to the declaration as amended was entered, and it was by written stipulation of counsel agreed that the ordinance of the mayor and city council of Cumberland granting to defendant in error the right to lay, operate, etc., natural gas mains in the streets of the city and distribute natural gas, should be read and considered by the court in determining such demurrer. The court below sustained the demurrer, and, the plaintiff electing to stand upon its declaration and not asking leave to further amend, dismissed the action with costs. And to review this judgment this writ of error has been sued out.

Wm. L. Marbury and W. C. Devecmon, for plaintiff in error.

Ferdinand Williams and Benjamin A. Richmond, for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and DAYTON, District Judge.

DAYTON, District Judge (after stating the facts as above). The plaintiff corporation was duly incorporated under a special act of the Maryland Legislature of 1853 (chapter 221), section 6 of which provides:

"That the president and directors shall have full power and authority to purchase or lease property, and to erect thereon the necessary buildings and works of the said company, and shall have power to manufacture gas of any material they may think best, and to dispose of the same for the lighting of the city of Cumberland, or the streets thereof, or any buildings, manufactories, or houses therein situated, and to effect this object, shall have power to lay pipes in and along any of the streets, lanes or alleys of said city; provided, that in so doing, they shall not injure the same; provided, however, that the mayor and city council assent to the same."

Section 7 of the act provides:

"That if any person or persons shall willfully do or cause to be done any act or acts whereby the works of said corporation or any part thereof shall be in any way injured or obstructed, the person or persons so offending shall forfeit and pay to the said corporation the amount of damages sustained by means of said offense or injury, to be recovered, with costs of suit, in the name of said corporation, before any court having cognizance of the same."

Section 9 of the act provides:

"That the Legislature reserves to itself the right to alter or repeal this act at pleasure."

In 1868 by chapter 471 the Legislature enacted a general incorporation law which provided for, among other things (section 30, Class 17), "the formation of gaslight companies," and by section 93:

"That any gaslight corporation formed under this act shall have full power to manufacture and sell, and to furnish such quantities of gas as may be required in the city or town where the same may be located, for lighting the streets and public and private buildings and for other purposes; and such corporation shall have power to lay conductors for conducting gas through the streets, lanes, alleys and squares in such city or town with the consent of the municipal authorities of said city or town, and under such reasonable regulations as they may prescribe."

Section 51 of this act provides:

"That no corporation shall possess or exercise any corporate powers, except such as are conferred by law, and such as shall be necessary to the exercise of the powers so acquired."

By an act, approved April 7, 1876, chapter 349, the above-cited section 93 was repealed and the following substituted:

"Sec. 93. That any gaslight corporation formed under this act shall have full power to manufacture and sell, and to furnish such quantities of gas as may be required in any city, town or county of this state, in which or adjoining which the same may be located, for lighting the streets, roads, and public and private buildings, and for other purposes; and such corporation is hereby authorized and empowered to lay conductors or pipes, for the transmission of gas, in any city, town or county, under the streets, squares, lanes, alleys, and roads thereof, paved or unpaved, and to connect the same with any manufactory, public or private building, lamp or other structure or object, and with the place of supply, subject, however, to any law or ordinance that may be passed by the municipal authorities of the city or town, or the county commissioners having jurisdiction, for the filling up and repaving any street, square, lane or alley or road under which the said pipes may be laid."

By other acts embodied in article 23, §§ 137 and 138, and article 81, § 164, of the "Public General Laws of Maryland," provisions are made for the doing business of foreign corporations in the state upon complying with certain conditions and in cases of electric construction companies and gas companies paying a state tax of one and a half per centum of their annual gross receipts.

Finally the Legislature in 1910 (chapter 55, § 142a, p. 72) enacted:

"Any gaslight corporation formed under this article shall have full power to manufacture artificial gas and to sell and furnish such quantities of gas both natural and artificial, as may be required in any city, town or county of this state, in which or adjoining which the same may be located, for lighting the streets, roads, and public or private buildings, or for other purposes, and such corporation is hereby authorized and empowered to lay conductors or pipes for the transmission of gas, both natural and artificial, in any city, town or county, under the streets, squares, lanes, alleys, and roads thereof, paved or unpaved, and to connect the same with any manufactory, public or private building, lamp, or other structure, or object, and with the place of supply, after first securing the proper assent of the municipal authorities of said city or town, or of the county commissioners of said county, under such reasonable and proper regulations and conditions that may be prescribed by them, subject, however, also to any law or ordinance that may be passed by the municipal authorities of the city or town or the county commissioners having jurisdiction, for the filling up and repaving of any street, lane or alley or road under which the said pipes may be laid."

The charter of Cumberland, at the time this controversy originated, conferred upon the municipality the power to pass all such ordinances, not contrary to the Constitution and laws of the state, as it may deem necessary for the good government of the city, for the protection and preservation of the city's property, rights, and privileges, for the protection of the health, comfort, and convenience of the citizens, for providing proper and suitable lights upon the public streets, to authorize and require the inspection of gas pipes, water pipes, plumbing, drainage, and electric lines or wires on private property or elsewhere, to regulate private connections with sewer, gas, and water pipes, and prohibited it granting to any corporation or individual any franchise, "unless notice of the same shall have been first published for at least two weeks in two newspapers in the city of Cumberland, and no franchise, right or privilege in relation to any highways, avenues, streets, lanes or alleys, either on, above or below the surface of the same * * * for a longer period than twenty-five years."

[1] In the solution of the question before us it seems to us first necessary to ascertain the status of the plaintiff corporation and define its rights and privileges under its charter and the several subsequent acts hereinabove quoted.  In doing so we must remember that it is elementary law that legislative acts granting franchises to private corporations are to be construed strictly according to their terms.  Grantees in such acts take nothing by implication, either as against the power making the grant, or against other corporations or individuals.

The reasons for this settled rule are set forth by the court in the leading case of Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, where it is said by Chief Justice Taney:

"The object and the end of all government is to promote the happiness and prosperity of the community by which it is established, and it can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created; and in a country like ours, free, active and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people.  *  *  *  The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform, transferred to the hands of privileged corporations.  The rule of construction announced by the court was not confined to the taxing power, nor is it so limited in the opinion delivered.  On the contrary, it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power, or any other affecting the public interest, the same principle applies, and the rule of construction must be the same."

In Rose's Notes on this case (volume 3, p. 681) it is said, touching this rule:

"It may be questioned whether the Supreme Court has ever laid down a more salutary doctrine than the principle here announced, and the citing cases which follow show how firmly it has become imbedded in our jurisprudence."

And more than 100 cases, from substantially all the courts of this country, in support of this statement are cited.

With this rule to govern us, we note:

(a) That this franchise was granted in 1853, 58 years ago.

(b) That it was not an exclusive one as that term is ordinarily used in connection with such franchises.

(c) That it was one at the will of the Legislature expressly reserving its right to alter or repeal it any time.

(d) That it was in express terms confined to the right to purchase or lease property, erect thereon the necessary buildings and works, manufacture gas of any material it may think best, and sell and dispose of the same for the lighting of the city of Cumberland, and the streets, buildings, manufactories, and houses therein.

(e) That to effect this object, and as an incident thereto, it was given power to lay pipes in and along any of the streets, lanes, or alleys of the city, but without injury thereto, provided that the mayor and city council assented.

(f) That, in case any one should willfully do any act injuring or obstructing its works, the corporation should be entitled to recover from such person the resultant damage therefor.

There is absolutely nothing in this charter conferring upon the plaintiff the exclusive monopoly of furnishing·light to this city or its inhabitants. It is conceded that the Legislature of Maryland could, at any time, have granted similar franchises to any number of companies to enter the city and compete with it in furnishing such lighting facilities. There is nothing in this charter that authorized it to furnish other than gas of its own manufacture. There is nothing that authorized it to furnish such manufactured gas for fuel or for any other purpose than that of lighting. By no possible implication can it be said to have excluded electricity or natural gas for combined heating and lighting purposes or either. Coal and wood at the time were entirely too cheap and plentiful to permit gas to be contemplated as a rival to either as a fuel, for it is to be remembered that 58 years ago, when this charter was granted, the use of manufactured gas was comparatively a few years old. It was not until 1798 that William Murdock, the Scot, demonstrated that gas distilled from coal could be put to practical use, and a short time thereafter Lebon, the Frenchman, ascertained it could be distilled from wood, and it was not until 1820, only 33 years before this charter was granted, that Neilson of Glasgow discovered the principle of the flat burner which afforded the means for the practical use of distilled gas for lighting purposes. Nor can it be assumed for a moment that the right under this charter should cover the supplying by plaintiff of either natural gas or electricity to this city, for petroleum was not discovered in this country until 1845 near Pittsburgh, and the commercial use of natural gas, found in connection with it, was not utilized until long after this charter was granted; and, as to electricity, it was not until 1863 that Nollet originated the magneto-electric battery whereby an illuminating current was generated. The electric lamp known as the "Jablochkoff Candle," the invention of a Russian military officer, came only in 1876, and it was still several years after before Edison perfected the incandescent lamp, whereby electric lighting was made practical. See Williams' History of Science, vol. 6, p. 201 et seq.

But it is contended that all this is immaterial because this declaration as amended is not based upon the exclusive right to furnish gas, but upon the violation of plaintiff's franchise authorizing it to lay gas pipes in and along the streets, lanes, or alleys of the city, or any of them, for the purpose of selling its gas to the city and its inhabitants.

[2] There can be no question that this power to lay pipe lines is a part of plaintiff's franchise; but it is a qualified right and, like all other grants of this character, must be strictly construed according to its very terms and subject to all its limitations. In this connection we note that by these terms and conditions it was empowered (a) to lay these pipes in these streets only after the assent of the mayor and council had been obtained. So far as its pipes are now laid, assuming that such assent has been obtained, it has a vested right to keep and maintain them, and, if any one shall willfully injure or destroy them,

it has right to recover damages for the resultant loss under section 7 of the charter act as above quoted; but (b) as to laying any further pipe lines in the streets where now laid, or in other or additional streets, it is a contingent right wholly dependent upon the will and consent of the mayor and city council; (c) that its sole right to lay such lines is for the purpose of conveying its manufactured gas from its works to the city and its customers therein. It cannot lay these pipes to convey oil, water, or any other substance, and it can only convey its gas through them so long as it exercises its franchise right to manufacture and furnish gas. If it shall abandon exercise of this last obligation, the right to maintain the pipe lines would immediately cease. It has no right to object to the laying of pipe lines through this city for the purpose of conveying oil or water except so far as the laying thereof might physically injure or destroy its own. No more has it right to complain because of the laying of pipe lines to convey natural gas into the city, if natural gas must be held, in a legal sense, not to be a competitor of its manufactured gas, and the sale of which, notwithstanding it may, like the sale of electricity, reduce or destroy its profits, does not conflict with its right, strictly construed, to furnish its manufactured gas for lighting purposes. Is natural gas a competitor in this strict legal sense of manufactured gas limited to lighting purposes?

Without taking time for original discussion of this proposition, it would seem to be sufficient to say that the use of natural gas both for fuel and lighting purposes originated in Pennsylvania, and this state and the two adjoining ones of Ohio and West Virginia may be considered possibly the largest producers of such gas of any of the states of the Union. We may, therefore, well look to the decisions of the courts of these states, where the question would be one of peculiar local interest and would receive at the hands of such courts careful thought and consideration for their views upon this matter. In 1903 the Supreme Court of Ohio (69 Ohio St. 259, 69 N. E. 436) decided the case of Circleville Light & Power Co. v. Buckeye Gas Co. et al., after elaborate argument. In this case the plaintiff had a franchise to furnish manufactured gas and electricity to the city of Circleville and its citizens for illuminating purposes and sought to enjoin the defendant from furnishing natural gas thereto under an ordinance of the city, which it claimed was invalid because it had not been ratified by a vote of the qualified voters of the city as required by a statute of the state which authorized a city's authorities to contract with any gas or water company for supplying gas or water for the city, but that no such company should go into operation in any city or village where such corporation had been formed, until after the question of authorizing such operation had been submitted to the qualified voters of the city or village, and authorized by ordinance. It was this authorization by vote it was alleged the defendant company had not obtained and was therefore furnishing natural gas to the city for illuminating purposes unlawfully and to plaintiff's loss of business and injury, for which reason an injunction was prayed. Upon demurrer to the bill, this question as to whether natural gas was a competitor of manufactured gas in a legal sense such as to warrant plaintiff relief was

the principal one involved. The court held that it was not and sustained the demurrer because: (a) The statute requiring the ratification by vote had been passed before natural gas for commercial use was known in the state, and could not therefore have been contemplated by it. (b) Because, while the word "gas" may be in one sense a generic term, it is quite plain that, as used in the statute, it does not embrace every species of gas discovered or manufactured in modern times. There are numerous gases manufactured or generated, used in the arts and manufactures, not contemplated by the statute. (c) Because the gas manufactured by the plaintiff was a substance produced by human skill and art, while natural gas comes from the great laboratory of nature, all ready for the immediate use of man when let to the surface of the earth. (d) Because the plaintiff in effect was claiming a monopoly in supplying gas to this city, and all doubt about the extent of plaintiff's monopoly must be resolved against it. Citing Justice Gordon on Appeal of the Scranton Electric Light & Heating Co., 122 Pa. 154, 15 Atl. 446, 1 L. R. A. 285, 9 Am. St. Rep. 79, where it is said:

"Monopolies are favorites neither with courts nor people. They operate in restraint of competition, and are hence as a rule detrimental to the public welfare; nor are they at all allowable except where the resultant advantage is in favor of the public. as, for instance, where a water or gas company could not exist except as a monopoly."

Also Justice Brewer in Omaha Horse Ry. Co. v. Cable Tramway Co., 30 Fed. (C. C.) 324–328, where it is said:

"He who says that the state has given him a franchise, a right to do that which without that franchise he could not do, will be compelled to show that the franchise, the right claimed, is within the terms of his grant. Much more strenuous must be the demand upon him for clear and explicit language in his grant when he claims that a part of it is not merely the franchise, the right to do, but also the right to exclude all others of the public from exercising the same right, and the state, as the representative of the public, from according the same right to another."

In the case we are considering, another important reason can be given. It is common knowledge that natural gas is now mainly utilized for fuel purposes; that its cheapness, coupled with its cleanliness and easy method of manipulation, enables it successfully to compete with wood and coal as such fuel, even more so, under existing conditions, than electricity can do, and it appears from the city ordinance, which by consent of parties herein is to be considered and read in this connection, that part of the consideration moving its adoption was the supplying this natural gas free to the city for heating purposes for the city hall, station house, all fire engine houses, the office buildings of the water commissioners, and all other buildings now or hereafter owned or occupied by the mayor and city council. On the other hand, it is undeniable that under its charter the plaintiff can alone supply manufactured gas for illuminating purposes. Can it be said that the city must, by reason of this restricted franchise of plaintiff's, which can only supply its lighting, be estopped from providing for itself and its citizens the better and more economic fuel? In 1887 the Supreme Court of Appeals of West Virginia decided the

case of Parkersburg Gas Co. v. City of Parkersburg, 30 W. Va. 435, 4 S. E. 650. There the city had, by ordinance, granted in 1864 to the plaintiff company "the exclusive privilege of using the streets, alleys and public grounds of said city for the purpose of laying down pipes for the conveyance of gas in and through the city, for the use of said city and its inhabitants." Afterwards the city made a contract with the Sunlight & Vapor Stove Company to supply certain of its streets with gasoline lights upon posts similar to those used by the gas company. Still later it authorized an electric light company to erect a plant and furnish electric lighting to the city and its inhabitants. The gas company brought its bill against this electric light company, the Sunlight & Vapor Company, and the city of Parkersburg, praying an injunction, which was granted by the court below. In reversing the case and directing the dismissal of the bill, the Supreme Court of Appeals does so upon two grounds: First, because it ascertained the powers of the city under its charter from the state did not warrant it to grant the exclusive franchise to plaintiff; and, second, because the plaintiff's franchise was a monopoly, not favored, to be strictly construed, and when so strictly construed not identical with those of the Vapor and Electric Companies. The court cites in this case approvingly Emerson v. Commonwealth, 108 Pa. 111, where it was held that the franchise of two charters—the one, the Fuel Gas Company, incorporated for the purpose of supplying "heat to the public from gas within the city of Pittsburg," and the other, the Pennsylvania Fuel Company, incorporated for the purpose of "supplying heat to the public within the city of Pittsburg by means of natural gas, conveyed from such adjoining counties as may be convenient"—were not identical and therefore not necessarily hostile to each other, the effect of which decision was construed to be that the grant of an exclusive right to one company to supply the city of Pittsburg with *manufactured* gas is not infringed by the grant of the right to another company to supply the city with *natural* gas. This decision in Emerson v. Commonwealth, 108 Pa. 111, decided in 1884, so approved by the West Virginia court, was the first, touching this question, rendered by the Supreme Court of Pennsylvania. It was a battle royal between counsel; some of the ablest lawyers on both sides that the state affords having been engaged. It was an action of quo warranto involving the construction to be given a statute authorizing the creation of corporations for the manufacture and supply of gas, and the supply of light or heat by other means, enacted in 1874 by the Pennsylvania Legislature. On January 19, 1882, the Fuel Gas Company had been chartered under this act to "supply heat to the public from gas within the city of Pittsburg." On February 22, 1882, a month following, the Pennsylvania Fuel Company was chartered "for the purpose of supplying heat to the public within the city of Pittsburg by means of natural gas conveyed from such adjoining counties as may be convenient." The first company contended that its franchise was exclusive, that the two franchises were identical, and the latter in consequence was void. The lower court so held, and judgment of ouster was entered. This judgment was reversed and venire

de novo awarded; the appellate court holding that the franchises were not identical. It was stated in argument that the first charter granted in Pennsylvania for the purpose of utilizing natural gas was not until 1879.

This case was subsequently cited and approved in Scranton Electric L. & H. Co. v. Scranton Ill. H. & P. Co., 122 Pa. 154, 15 Atl. 446, 1 L. R. A. 285, 9 Am. St. Rep. 79, decided in 1888. Finally, in 1894 the same court decided the case of Warren Gaslight Co. v. Pennsylvania Gas Co., 161 Pa. 510, 29 Atl. 101, involving exactly the question under discussion here. The Warren Company was chartered by special legislative act in 1869 having exclusive right to supply Warren with gas, to erect buildings for its manufacture, and to lay pipes for its transmission in the streets. The Pennsylvania Company was subsequently chartered for the purpose of supplying this borough of Warren with natural gas. Plaintiff company applied for injunction, which was denied, and the bill dismissed. In this case distinction is made between franchises to furnish natural gas and those to furnish manufactured gas, the two are held not to be identical, and the two gases are held not to be in a legal sense competitors. The case is of further interest because there, as here, the relief sought was based upon plaintiff's franchise to lay pipes in the streets. Touching this contention, the court says:

"It is contended by the solicitors for the plaintiff that the plaintiff's franchise gives it the exclusive right to lay pipes in the streets, and that the right to lay pipes in the streets is the franchise which the plaintiff received from the commonwealth, and that the defendant should be restrained from laying pipes in the streets. We cannot so view the case. Of course, if defendant could be restrained from the use of the streets for laying pipes, the whole purpose of the plaintiff would be accomplished thereby, for there is no known means of conveying gas except by pipes, and pipes in a town or city could only be laid in the streets. The laying of pipes for the transportation of gas is a mere incident to the business and not the business itself. The business was the delivering and sale of natural gas for light and heat; the transportation is incidental thereto. The same is also true of water companies; they produce, store, and supply to customers water. Transportation by pipes is the means of delivering and is a mere incident of the business."

We might well base the decision of this question upon these authorities alone; but because of the importance of the case, and the fact that a different ground appeals more strongly to the judgment of one of our number, we propose to consider the further proposition as to whether the mayor and city council of Cumberland was authorized and empowered legally to pass the ordinance complained of authorizing the defendant to furnish its natural gas to the city and its inhabitants and to lay its pipes in the streets for the purpose. While municipal charters are not to be construed so strictly as franchises granted to private corporations creating monopolies, yet, as regards them, the general rule holds good that every statute which takes from Legislature its power will always be construed most strongly in favor of the state. The rules of construction obtaining as to these municipal corporations are aptly stated by Dillon when he says:

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied

in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation, the charter or statute by which it is created is its organic act. Neither the corporation nor its officers can do any act, or make any contract, or incur any liability, not authorized thereby, or by some legislative act applicable thereto. All acts beyond the scope of the powers granted are void. Much less can any power be exercised, or any act done, which is forbidden by charter or statute. These principles are of transcendent importance and lie at the foundation of the law of municipal corporations." Dillon on Munic. Corp. (4th Ed.) § 89 (55), p. 145.

It is most earnestly contended by counsel for plaintiff that the charter of Cumberland, examined by these rules, cannot be held to be broad enough to permit the passage by its council of this ordinance under its general welfare clauses: (a) Because gas and other lighting companies are not mentioned therein; and (b) because the power to use the public streets to distribute gas for private use is not indispensable for either "the good government of the city," the "protection and preservation of peace and good order and securing persons and property from violence, danger or destruction," or the "protection of the health, comfort and convenience of the city," and direct authority (Abbott on Mun. Corp. vol. 3, 2092, § 890; Elliott, Mun. Corp. 84, § 72) is cited. On the other hand, Dillon, in the historical review introductory to his great work (section 3a), after calling attention to the similar conditions existing in ancient Rome and our modern cities, says:

"In a most important particular, however, Rome suffers by comparison with modern cities: *Its public places were not lighted.* All business closed with the daylight. The streets at night were dangerous. Property was insecure. No attempt at public illumination was made. The idea does not seem to have occurred to them. Persons who ventured abroad on dark nights were dimly lighted by lanterns and torches. Its condition was similar to that of London, 200 years ago, so graphically described by Macaulay. * * * No more forcible illustration of the necessity and advantages of lighting a city can be given than the pictures drawn by Lanciani and Macaulay of the state of a great city buried in the darkness of night; *and they show how clearly the power to provide for this is essentially and particularly one pertaining to municipal rule and regulation.*"

And further on (section 692), speaking of a general grant to a municipal corporation to light its streets, such as is contained in this charter to Cumberland, he says:

"*A general grant,* while it carries with it, by implication, all such powers as are clearly necessary for the proper and convenient exercise of the authority conferred, such as using the streets for mains and for placing lamp posts, and making *contracts or adopting ordinances* proper to the execution of the power, does not authorize the city council to grant to any person or corporation an *exclusive right to use the streets* for the purpose of laying down gas pipes for a term of years, and thereafter until the work shall be purchased from the grantee by the city. The court admitted that the power to light the city would authorize the council to contract for gas, and to grant the contracting party the use of the streets, but denied its authority to make such use exclusive for a determinate future period"—citing State v. Cinc. Gasl. & C. Co., 18 Ohio St. 262; Indianapolis v. Indianapolis Gasl. & C. Co., 66 Ind. 396; Parkersburg Gas. Co. v. Parkersburg, 30 W. Va. 435, 4 S. E. 650.

But the question need not be discussed further because it is decisively determined by another fact found here. In the rules of construction of municipal charters which we have quoted, it is stated such corporations cannot "do any act, or make any contract, or incur any liability not authorized thereby (its charter) *or by some legislative act applicable thereto*," and we have already called attention to the fact that the Legislature of Maryland, in 1868, incorporated in a general incorporation law (section 93) full power to gas companies to manufacture and sell and to furnish gas to any and all cities and towns and to their inhabitants in the state, and to that end fully empowered such companies to lay pipes in the streets of such cities and towns with the assent of the municipal authorities. This section was re-enacted and broadened in its terms by the Legislature in 1876, and there can be no question that it empowered the companies chartered and operating under it to occupy the streets of Cumberland for the purpose of furnishing gas for lighting purposes after the assent of the mayor and city council had been obtained. The suggestion that this act nowhere empowers such companies to furnish gas for *fuel* purposes may be here dismissed at once. The plaintiff cannot possibly be concerned in it, simply because its own charter never conferred upon it any right to furnish gas for any such purpose or for any other purpose than for illumination.

The question then narrows itself down to whether the defendant company was one authorized under this general incorporation law to engage in this business. It is true that the terms of the act say "any gaslight corporation formed under this act," and it is admitted that defendant company was not formed under it, but is a foreign corporation existing under the laws of West Virginia.

[3] Since Bank v. Earle, 13 Pet. 519, 10 L. Ed. 274, was decided, it is well settled:

"That a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and, where that law ceases to operate and is no longer obligatory, a corporation can have no existence. It must dwell in the place of its creation and cannot migrate to another sovereignty."

[5] Such corporations are not "citizens" within the meaning of article 4, § 2, of the federal Constitution, entitling them "to all privileges and immunities" as such "in the several states," nor do they come under the protection of section 1 of the fourteenth amendment, prohibiting the abridgment of such privileges and immunities, but under this amendment they cannot be denied "the equal protection of the laws."

See Kirven v. Va.-Car. Chem. Co., 76 C. C. A. (4th Ct.) 172, 145 Fed. 288.

But, while all this is true, it by no means follows that a corporation will not be recognized in states other than that of its creation. Its residence in one place creates no insuperable objection to its power to contract in another. Under the well-recognized principle of comity, a foreign corporation may transact in the domestic state such business as its charter authorizes, and may make all contracts in the

course of its business there, not in violation of the laws and public policy of the domestic state. And this comity, forming, as it does. the basis of recognition of foreign corporations, is binding on the courts as being part of the common law of the state. It must be presumed to exist, and does exist, until a state expresses an intention to the contrary in some affirmative way, that is, by direct enactments on the subject, or by its settled public policy deduced from the general course of legislation or the settled adjudication of its courts of last resort. An intention to prohibit a foreign corporation from transacting business in the domestic state cannot be inferred from the fact that its Legislature has made no provision for the formation of similar corporations, or allows corporations to be formed only by general law. Bank v. Earle, 13 Pet. 590, 10 L. Ed. 274; Christian Union v. Yount, 101 U. S. 352, 25 L. Ed. 888; Runyan v. Coster, 14 Pet. 122, 10 L. Ed. 382; Cowell v. Col. Springs Co., 100 U. S. 55, 25 L. Ed. 547; Kennebec Co. v. Augustine Ins. Co., 6 Gray (Mass.) 204; Stoney v. Am. L. Ins. Co., 11 Paige (N. Y.) 635; Thompson v. Waters, 25 Mich. 224, 12 Am. Rep. 243; Story, Conflict of Laws, § 36; 13 Am. & Eng. Enc. Law (2d Ed.) 838.

And the Court of Appeals of Maryland has fully recognized and approved these principles in Lycoming F. Ins. Co. v. Langley, 62 Md. 196.

[4] How far such comity shall be extended, within what limits it shall be restricted, are purely matters for the decision of the sovereign state. which alone can extend or limit its operation or refuse wholly its exercise. This has been well held by the Supreme Court of North Carolina in Tobacco Co. v. Tobacco Co., 145 N. C. 367, 59 S. E. 123, in an able and well-considered opinion by Judge Connor, now an associate of ours on the federal bench.

For the reasons stated, we are convinced that the court below did not err in the conclusion that plaintiff could not maintain its action, and therefore its order sustaining the demurrer to the declaration must be affirmed.

GOFF, Circuit Judge. I dissent. In my judgment the declaration states a cause of action, and I think that the court below erred in not overruling the demurrer.