CENTRAL POWER CO. v. CITY OF HASTINGS et al.

District Court, D. Nebraska, Hastings Division.

Aug. 13, 1931.

488

Cleary, Suhr & Davis, of Grand Island, Neb., and Stiner & Boslaugh, of Hastings, Neb., for Central Power Co.

Roscoe S. Hewitt, City Atty., of Hastings, Neb., and Ernest B. Perry and Lloyd J. Marti (of Perry, Van Pelt & Marti), both of Lincoln, Neb., for City of Hastings.

WOODROUGH, District Judge.

This case is tried upon the bill in equity, the answer, and the evidence and the court has considered briefs and requests for findings and conclusions timely submitted by defendants. The substance of the bill is outlined by counsel as follows:

I. The plaintiff, the Central Power Company, is a corporation organized under and by virtue of the laws of the state of Delaware.

The defendant, the city of Hastings, is a municipal corporation, created and existing under the laws of the state of Nebraska, and is a city of the first class, with a population of more than five thousand and less than twenty-five thousand people.

The individuals named as defendants are the mayor and members of the city council of the city of Hastings, Neb.

II. The amount in controversy exceeds the sum of $3,000.

The plaintiff and defendants are residents and citizens of the states of Delaware and Nebraska respectively.

The subject-matter of the controversy set out in the bill of complaint arises within the contemplation and provisions of section 1 of the Fourteenth amendment and section 10 of article 1 of the Constitution of the United States.

III. The plaintiff is a public utility and for more than fifteen years past has been and now is engaged in the distribution of gas to the city of Hastings and its inhabitants by virtue of a franchise granted plaintiff by the city of Hastings in accordance with the laws of the state of Nebraska.

The gas distributing system owned by plaintiff and operated in the city of Hastings is the only gas distributing system operating in said city and is now serving gas to more than twenty-five hundred customers.

During the course of existence of plaintiff company, it has constructed and laid gas pipes in and under the streets of the city of Hastings, and as a public utility is under duty to serve the public with gas.

IV. Since the granting of the franchise (October 11, 1915, franchise attached to bill of complaint and made a part thereof),

plaintiff has distributed manufactured or artificial gas. Until recently no natural gas was available for distribution.

Plaintiff took advantage of an opportunity brought about by the construction of pipe line from the gas fields in Texas and Kansas through the state of Nebraska and near the city of Hastings to acquire, and it has made arrangements for, a supply of natural gas to be distributed to the city of Hastings and its inhabitants.

Plaintiff has now signed a contract for the furnishing to it of an adequate, continuous, and sufficient supply of natural gas to respond to the needs and requirement of its patrons and to the public.

That natural gas is more efficient than manufactured or artificial gas and can be obtained at less cost to the plaintiff, and therefore can be supplied to the city of Hastings and the inhabitants of said city at a lower price than at which artificial or manufactured gas can be supplied.

That, by the substitution of natural gas in the place of artificial gas, the plaintiff can better serve the city of Hastings, its inhabitants, and the public, and can better carry out and perform its duty and obligation under its contract to furnish light and heat to the city and its inhabitants.

V. As a result of the contract and arrangements between the plaintiff and the Nebraska Natural Gas Company, arrangements have been made and completed for the construction of adequate transmission lines for the transmission of natural gas to the plaintiff in quantities sufficient to supply the public now being served or to be served.

The transmission lines of the Nebraska Natural Gas Company has been or will immediately be completed to the city limits of Hastings, and the Nebraska Natural Gas Company is ready to receive natural gas through such transmission lines.

The plaintiff is ready and desires to complete all lines of connections necessary for receipt and distribution of natural gas, and the making of the connections constitutes ordinary or normal gas line construction wholly consistent with the safety of the public.

VI. In order to make the proper connections for the receipt of the natural gas and distribution thereof, it is necessary for the plaintiff to lay a transmission or pipe line from its plant to the transmission line of the Nebraska Natural Gas Company where it comes to the corporate limits of the city of Hastings.

When the plaintiff made the preparation to exercise its rights to lay such transmission pipes connecting with the transmission line of the Nebraska Natural Gas Company, and indicating their intention to engage in the distribution of natural gas, the defendants forbade them to do so.

Plaintiff was notified by the mayor and the city council that it would not be permitted to lay the necessary pipes and make these connections unless and until the plaintiff should submit to the defendant a new schedule of charges for natural gas, such schedule to be satisfactory to and approved by the defendants.

Defendants have asserted that the plaintiff would not be permitted to distribute natural gas to the inhabitants of the city of Hastings through its (now) distributing system unless and until the plaintiff should have secured a new franchise and submitted to the defendants a new schedule or rates or charges for the natural gas to be consumed in said city. All of this, notwithstanding the fact that natural gas contains approximately double the heating value of artificial gas.

Plaintiff charges that, under the terms of the franchise, it is entitled to maintain, extend, and enlarge its system in such manner as the public service requires, subject only to such reasonable police regulations as may be imposed by authority of the city, and that it has the right under its franchise to distribute natural gas through its system and through such extensions of the system as may subsequently be required for the purpose of adequately serving the inhabitants of the city of Hastings.

Plaintiff charges that the action of the defendants in preventing the plaintiff from utilizing its present system for the distribution of natural gas is wholly and entirely arbitrary, oppressive and illegal; and that such action on the part of the defendants was and is with the intent and purpose of carrying out an ulterior design against the plaintiff in order to force plaintiff to accept an arbitrary schedule of charges for natural gas below charges that are reasonable, lawful, just, and proper.

That a change from artificial to natural gas as is proposed and intended by plaintiff will result in a saving to the inhabitants of the city of Hastings and users of gas of not less than $30,000 per year.

490

VII. That the present investment by plaintiff in the city of Hastings amounts to more than $300,000, and that plaintiff has only received a small net profit in the operation of its gas plant, and even with the most economical administration will be able to make only a small net return, which is not compensatory upon the actual amount of its investment.

To continue the manufacture and distribution of artificial gas and give the service necessary and such as plaintiff is obligated under the terms of its franchise will require the immediate outlay by the plaintiff in repairs, replacements, and necessary new equipment for the manufacture of artificial gas of not less than $50,000; all of which will be rendered unnecessary if plaintiff is permitted to exercise its right to introduce and distribute natural gas.

If permitted to prepare its system as proposed for the receipt of natural gas by reasonable and safe extensions of its mains and to distribute natural gas, the volumes of consumption by the city of Hastings will be greatly increased, and it will be able to sell a larger volume of highly efficient and economical fuel, and the plaintiff, as well as the public, will be benefited and plaintiff can earn a reasonable return upon its investment.

If plaintiff is prevented from making such extension for the receipt of natural gas, and prevented from distributing natural gas, plaintiff will be deprived of its vested contract and franchise rights and forced to operate and continue for an inadequate and confiscatory return, if not an actual loss upon the fair value of its system.

VIII. Plaintiff charges that under the terms of its franchise it is vested with the right of supplying the inhabitants of Hastings, Neb., with natural gas to the extent that it was and is invested with the right to supply artificial gas, there being no tangible or substantial difference, except natural gas is more efficient than, and is superior to, artificial gas.

The denial by the defendants of the right of plaintiff to extend its system and supply natural gas to the inhabitants of the city of Hastings deprives plaintiff of its property without due process of law, and denies plaintiff the equal protection of the law.

The acts of the defendants in forbidding plaintiff to carry on its business, as authorized by law and by its charter (franchise), constitutes an undertaking on the part of the governing authorities to pass law and enforce demands impairing the obligation of the contract which is forbidden by the Constitution of the United States and by the Constitution of the state of Nebraska.

If defendants are permitted to carry out their unwarranted and unlawful plans and are permitted to prevent plaintiff from carrying on business, plaintiff will suffer irreparable financial losses in its business.

If defendants are prevented from carrying out their avowed purposes in the premises, both plaintiff and the citizens of Hastings, Neb., will be able to obtain a highly efficient satisfactory fuel superior to artificial gas and at a cost lower than artificial gas, and plaintiff will be able to earn a fair and reasonable return on its investment in said city.

IX. In addition to the great loss which plaintiff will sustain as above set forth, unless an injunction as prayed for is granted, plaintiff is advised and believes, and therefore charges, that if it shall undertake to extend its system to connect with the transmission line of the Nebraska Natural Gas Company, and if it shall undertake to distribute natural gas in Hastings, plaintiff and all its officers, agents, and employees will be prosecuted criminally for trespass and will be harassed by being arrested, fined, or imprisoned under charges of trespass or violation of regulations and ordinances of the city and will be subjected to multiplicity of criminal prosecutions, etc.

Unless defendants are enjoined by this court from carrying out their avowed purpose of preventing plaintiff from distributing natural gas in Hastings and from extending and improving its gas distribution system, plaintiff will be damaged in a large sum, and such loss and damage will be irremediable, and that plaintiff will have no way of recovering all or any part of the loss, since the action of defendants cannot be made the basis of an action at law, and damages for illegal acts cannot be awarded plaintiff.

That plaintiff has no complete, speedy, or adequate remedy at law and can obtain relief only in a court of equity.

X. Plaintiff expresses its willingness to execute such bond for protection of defendants as the court may require.

Plaintiff offers to do equity and to abide by all orders and decree of this court.

Plaintiff is advised, believes, and charges that it is entitled to come into this court of equity and to pray for and receive a restraining order and writ of injunction directed to the defendants and each of them, com-

manding and enjoining defendants and each of them from in any way interfering with plaintiff's plan and purpose of extending and improving its distributing system and supplying and distributing natural gas to the inhabitants of Hastings by and through its present distributing system.

On final hearing of this cause, plaintiff is entitled to an order of this court perpetually enjoining defendants and each of them from doing all and singular the unwarranted, arbitrary, and illegal acts set out in the bill of complaint, and perpetually enjoining them from molesting or interfering with plaintiff carrying out its legal plan and purposes as set out in the bill of complaint.

XI. That on or about the 1st of January, 1925, the plaintiff, Central Power Company, purchased of the Hastings Gas Company all of its gas works, plant, pipes, and all of its property, franchise rights, and privileges, including the franchise herein referred to and attached to the bill of complaint and made a part thereof.

The plaintiff became the successor of and succeeded to all the franchise property rights and privileges of the Hastings Gas Company and is now, and has been at all times since January 1, 1925, the absolute owner and holder of the franchise attached to and made a part of the bill of complaint.

Plaintiff prays:

That the city of Hastings and each and all of the individuals as the members and only members of the city council of the city of Hastings may each and all be served with process, requiring them to appear and plead as required by the law and practises of this court, but their answers under oath are waived.

That restraining order be forthwith granted in favor of plaintiff and directed to the defendants, and each of them, enjoining and restraining them from in any wise enforcing, or attempting to enforce, as against plaintiff, its officers, agents, servants, and attorneys, their orders or threats as set out in the bill of complaint, and from arresting or prosecuting, harassing, or interfering with plaintiff, its officers, agents, or servants on account of plaintiff extending and improving its gas transmission system, and on account of plaintiff distributing natural gas in and under the streets of Hastings, by means of its present pipes or pipes to be hereafter properly laid, so long as plaintiff does the necessary work in an orderly and lawful manner, subject to the reasonable police regulations of the city in the matter of the physical laying and connecting of its pipes and appliances for the receipt and distribution of natural gas.

Plaintiff then prays for a writ of injunction as to the same matters as set forth in the preceding paragraph.

Plaintiff prays that on final hearing the temporary injunction be made permanent.

### The Answer.

The answer for the city and its officers puts in issue all of the claims of the plaintiff concerning the availability of natural gas in dependable quantity, quality, or steady flow, and that plaintiff's plant is adapted to transmit the natural gas, and that natural gas is more economical or fit for the requirements of the city and its inhabitants. They allege that the plaintiff caused the question of substituting natural gas to be submitted to a vote of the people of Hastings, and that the vote was overwhelmingly against natural gas. That the vote was taken on the agreement that the plaintiff would abide the result of it, and that on account of those proceedings there is a want of equity in the plaintiff's case. They also set up certain court proceedings brought and pending wherein the Nebraska Natural Gas Company is involved, that being the corporation which proposes to furnish natural gas to the plaintiff for distribution in Hastings. They deny arbitrary or wrongful interference with the plaintiff, but insist that the plaintiff has no right or power under its franchise to substitute or use its plant to supply natural gas instead of the type it is now and has been furnishing.

They also allege that, as a substantial part of the franchise contract, the city has the right to buy the plaintiff's plant, including the manufacturing and storage equipment; that the substitution of natural gas will result in impairment of the property from disuse to the detriment of the city's rights. It is also alleged that plaintiff is estopped because of a certain new rate agreement made between the city and the plaintiff in August, 1929. By further appropriate allegations the questions of want of good faith on plaintiff's part, want of equity in its case, and jurisdiction of this court are put in issue.

### Opinion.

The case comes clearly within the federal jurisdiction because the parties are of diverse citizenship and the amount involved is sufficient. Section 41, title 28, U. S. C. (28 USCA § 41); Glenwood Light & Power Co. v. Mutual Light, Heat & Power Co., 239 U. S.

121, 36 S. Ct. 30, 60 L. Ed. 174; Mutual Oil Co. v. Zehrung (D. C.) 11 F.(2d) 887. It is also clearly within the equity jurisdiction as the object is to protect claimed franchise rights against alleged continuing impairment for which there is no adequate remedy at law. 26 Corpus Juris, 1047; 32 Corpus Juris, 332; Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 26 S. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253; Lincoln Traction Company v. Omaha, L. & B. R. Co., 108 Neb. 154, 187 N. W. 790, 28 A. L. R. 960.

I consider first the question as to the election which has been held in Hastings and whether this court can be relieved of the burden of decision because of the result of the vote. The evidence is that the plaintiff did request the submission that was made to the voters and paid the expense thereof. The evidence does not sustain the claim that any agreement was entered into by the plaintiff that it would abide the result of the election.

█ The question submitted to the voters was whether a new franchise should be granted to the plaintiff for twenty-five years "for the operation of a gas system for the transmission, distribution and sale of either natural or artificial gas" at rates not to exceed those specified and upon conditions elaborated in the proposal, but not necessary to detail here. Obviously the question that was submitted to and voted upon by the people of Hastings is not the question that is raised before this court. The people voted against giving the plaintiff a new twenty-five year franchise, whereas in this lawsuit the plaintiff is simply seeking to protect rights it claims to have under a franchise long since granted. But even if they had voted "no" on that question, the court would none the less be obliged to try the case and pass upon it judicially. In McPhee & McGinnity Co. v. Union Pacific R. Co., 158 F. 5, 12, the Circuit Court of Appeals in this circuit had before it an instance of the same kind. The question was whether the Union Pacific had a franchise to lay certain tracks in Denver, and the court said: "The fact is repeatedly urged upon our attention that the railroad company tried and failed to get permission to lay and operate its tracks upon this street by a vote of the taxpaying electors. This circumstance, however, does not appear to determine the legal question whether or not the revocable permission subsequently obtained from the council was a prohibited franchise. It may be that counsel for the railroad company advised an election out

of abundance of caution to avoid, if possible, litigation of the character now under consideration, and if, as seems to be contended, the action of the company establishes the fact that its counsel were of the opinion at the time of the election that the privilege under consideration was a franchise, they appear to be now of the opposite view, and their earlier opinion is no better evidence that their later opinion is wrong than their later opinion is that their earlier one was erroneous."

Having carefully considered all that was said and done leading up to the election and results, I find in none of the proceedings any bar to the prosecution of this case by the plaintiff.

Defendants have also made proof of negotiations and an agreement between the city council and the plaintiff concerning a change of rates in August of 1929. It does appear that a concession was made by the city to the plaintiff at that time, in that the minimum British thermal units content of the gas fixed in the franchise was reduced, but I find nothing in the proceedings to prevent the maintainance of this action by the plaintiff.

As to the suits wherein the Nebraska Natural Gas Company is a party, no adjudication has been made therein which in any wise affects the plaintiff's right of action in this case.

█ The real question of great importance is whether the plaintiff's franchise confers the right to substitute natural gas. The franchise was granted to plaintiff's predecessor in interest in 1915 under the statute authorizing cities of the class of Hastings upon a vote of the people to make a contract with the company to permit the company to erect gas works in the city and to give the company the privilege of furnishing gas for heat during the period of twenty-five years. Section 4954, Neb. Rev. St. 1913. The franchise was duly authorized by vote of the people and grants the privilege "to construct, operate, maintain, repair and extend a system of Gas works, and to furnish to said city and its inhabitants gas for light, heat or power purposes and to use the streets, alleys and public places of said city for the purpose of laying and maintaining its mains and service pipes." There is no description of the gas other than the requirements that it should give a monthly average total heating value of not less than 600 British thermal units, with a minimum which shall never fall below 550 British thermal units. As the natural gas which the plaintiff proposes to

furnish the city is a "gas," and gives a heating value of much more than 600 British thermal units, there is nothing in the words of the franchise or in the ordinary meaning of the words to hinder the plaintiff from furnishing natural gas. But the claim against the natural gas is that the court should gather from the circumstances under which the franchise was granted and the furnishing of manufactured gas under the franchise for sixteen years and from the reference to "gas works" in the statute and the franchise that the intention was to limit and restrict the company to manufactured gas, even though it does not say so in the wording of the franchise.

It is well settled that a franchise when ambiguous must be construed strictly for the grantor, that is, the people, and privileges not unequivocally granted are withheld. Piedmont Power & Light Co. v. Graham, 253 U. S. 193, 40 S. Ct. 453, 64 L. Ed. 855; Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 50 L. Ed. 353; Blair v. Chicago, 201 U. S. 400, 26 S. Ct. 427, 50 L. Ed. 801; Mitchell v. Dakota Central Telephone Co., 246 U. S. 396, 38 S. Ct. 362, 62 L. Ed. 793.

It is argued for the city that the reference in the statute and the franchise to "gas works," even though it does not by the words used positively limit the plaintiff to making its gas in a gas works, creates an ambiguity, and the ambiguity ought to be resolved for the city against natural gas. I hold against the contention. It seems to me that it was not in the mind of either the Legislature of Nebraska or the city of Hastings that there was anything desirable in having a gas works in the city—some of them had been found nuisances per se—but the desirable thing in mind was the gas with its heat value. Accordingly I consider that the desire to obtain the gas with its heat value was the inducement for both the legislative enactment and the franchise.

As no natural gas was available or within any reasonable prospect of becoming available, it was thought that the right to erect gas works had to be accorded to accomplish the end of getting the gas.

But there is nothing in the statute to even remotely suggest that, if the franchised company could get the gas without making it in a gas plant, there should be any restraint upon so doing. The argument for the city goes to the extent that, under the statute and on account of the reference therein to "gas works," none of the cities in the state of the class of Hastings have any power to have natural gas furnished its inhabitants under any franchise. The interpretation appears to me unreasonable. While it was not known to legislators or councilmen that natural gas would become available, it was well known that a vast amount of research was and long had been carried on by gas companies. That improved and even new processes were constantly evolving and better and very different gas produced. Water gas followed coal gas and now carburetted water gas. I find nothing in the law or the franchise to hinder these improvements, however greatly each and all of them cause the distributed gas to be different from what it was to start with. The existence of differences between one gas and another that may be offered to the city is not of itself determinative or even important. Attorneys for the city have cited cases in which the facts that manufacturing gas is a different thing from taking it out of the ground and that natural gas is different from manufactured gas were found to be important facts in determining the particular cases. I have examined all of these cases, but without being persuaded that any authoritative decision militates against the conclusion that the plaintiff in this case is not prevented by the law or the terms of its franchise from furnishing a natural gas if the natural gas comes up to the requirements that are expressed and implied. Union Light Heat & Power Co. v. Young, 146 Ky. 430, 142 S.W. 692; Cumberland Gaslight Co. v. West Virginia & Maryland Gas Co. (C. C. A.) 188 F. 585; Consumers' Gas Trust Co. v. Quinby (C. C. A.) 137 F. 882; Id. (C. C.) 140 F. 362; Circleville L. & P. Co. v. Buckeye Gas Co., 69 Ohio St. 259, 69 N. E. 436; Findlay Gas Light Co. v. Findlay, 20 Ohio Cir. Ct. R. 237; Emerson v. Commonwealth ex rel. Attorney General, 108 Pa. 111; Warren Gas Light Co. v. Penn. Gas Co., 161 Pa. 510, 29 A. 101. On the other hand, the decision of the United States Circuit Court of Appeals for the Fifth Circuit in April of this year spoke directly to the issue here presented as follows: "It is contended by the city that the provisions of the franchise for the erection and maintenance of a plant for the manufacture of artificial gas require a construction that the company was restricted to the distribution of that kind of gas and exclude any right to distribute natural gas. Such construction would not be in favor of the people of Laurel. The main object to be achieved was the supplying of gas for heating and lighting. It may well be that natural gas is both better and cheaper. It is merely incidental

to the furnishing of gas that it be first manufactured. If nature performs that function, it would be a reasonable construction of the franchise that the right to furnish gas to the city of Laurel includes the furnishing of natural gas. If that is done, the right to generate the gas then becomes incidental and immaterial." City of Laurel v. Mississippi Gas Co. (C. C. A.) 49 F.(2d) 219, 220.

In practically every contract some things are necessarily implied and the canons of interpretation of franchise contracts are the same as with other contracts. Union Light, Heat & Power Co. v. Young, 146 Ky. 430, 142 S. W. 692. So it is undoubtedly implied in this plaintiff's franchise that the gas it is given the privilege to furnish to the people and the city of Hastings shall be fit for the purposes intended, and a large volume of evidence on that question has been laid before the court.

The plaintiff assumed the burden to prove that it was assured an ample and constant supply of natural gas under contract with the Nebraska Natural Gas Company to be supplied from the gas fields of Kansas and Texas; that the natural gas will give a total heating value much greater than the 600 British thermal units required by the contract; and that the natural gas is cheaper and better for all requirements than the present gas. Each of the claims were questioned on behalf of the city and request made for it that the court find:

(1). That natural gas explodes more quickly than artificial gas and is dangerous.

(2) That natural gas has a greater carbon content and has a greater tendency to blacken cooking utensils.

(3) That natural gas does not furnish as intense or quick a heat as artificial gas.

(4) That burning equipment must be replaced in case natural gas is substituted.

(5) That natural gas is more easily extinguished and easily affected by slight air currents.

(6) That the heat content of natural gas is variable.

(7) That leaks of natural gas will be excessive and proper pressure could not be maintained in the plaintiff's distribution system, and natural gas will therefore be unsatisfactory.

Testimony was taken from witnesses who disclosed profound study of and intimate familiarity with each of these matters. Personally I had no opinion to start with and now reflect only the impressions made by the testimony. I conclude from the testimony:

(1) That the dangers from explosion of natural gas are less than from artificial gas, because the range of mixtures of air and natural gas which are explosive is very much narrower. The first point of saturation with air at which either gas will be explosive is not demonstrated by the evidence. It appears to be the general practice when furnishing natural gas to odorize it, and the plaintiff expects to do so.

(2) Although the chemical analysis of natural gas shows more carbon; it does not blacken cooking utensils.

(3) The natural gas in practical use heats whatever is to be heated as quickly and efficiently as artificial gas.

(4) Burning equipment does not ordinarily have to be replaced, but simple and satisfactory adjustments are quickly and easily made.

(5) No practical disadvantage is found in practice in regard to any tendency of the natural gas flames to be extinguished by ordinary or slight air currents.

(6) There are no such variations in the heat value of the natural gas due to variations in pressure or otherwise as to impair its efficiency in use.

(7) There is no reason to expect any excessive leakage of the natural gas from the plaintiff's distribution systems. The joints of the pipes are sealed with oakum and lead or they are screw joints; in either event, where they remain as designed, they are sufficient to contain the natural gas under the low pressures anticipated. I am not persuaded from the testimony on the subject that the "tarry" substances carried and deposited by artificial gas give that gas any element of superiority.

On the whole question of fact, the evidence adduced before this court is that the natural gas is in every way and for every use and purpose discussed a better and cheaper fuel. Further, the evidence greatly preponderates to the effect that it is entirely feasible and practicable for the plaintiff to receive and distribute the natural gas through its distribution system without any increase of danger and at a substantial saving to the citizens, the city, and the plaintiff. An impression drawn from the whole testimony is that the natural gas produced by nature's slow processes in the bowels of the earth is the very goal at which the scientific research

with quick synthetic processes has been directed, though I need not so declare.

 Such being the conclusions of fact drawn from the evidence, it follows that the plaintiff has a right under its franchise to furnish natural gas instead of artificial gas, and should be permitted to do so without interference from the city or its officers. The officers however are advised and believe that the plaintiff does not have such a right, and on account of such belief they have refused to permit the company to proceed. They deny any threats or use of force or any bad faith or intention to coerce the plaintiff. Still the situation is such that an injunction must issue to assure an orderly execution of the franchise contract between the city and the plaintiff. It is pointed out by the city that the present adjusted rate schedule will become inapplicable to natural gas, and that is so. The new rates must be cheaper. Also that some present details of regulation will be found inapplicable. That also is probable, and that some new regulations will be required. The franchise contract fixes a minimum British thermal units content which is insufficient for natural gas. The evidence is that the British thermal units content of the natural gas should be not less than 1,050 British thermal units. The sole purpose of fixing the minimum British thermal units content in the franchise was to insure the best gas available at the time and under all the circumstances and to afford a standard to check up on the company. The court finds that such was the true intent of the contract. Upon substitution of the natural gas, such mutual intent must still be carried out, and failure to do so would constitute a breach of the contract. The minimum or checking standard was changed by agreement between the council and the company in August, 1929. The matter is not of the essence of the franchise contract, but an incident. A new minimum should be agreed upon or fixed by the court, if necessary. It is apparent in short that this court need not in its order of injunction attempt to cover all contingencies which may ultimately arise out of the substitution of natural gas in Hastings. Injunction should issue enjoining such interference with the exercise of plaintiff's rights as defendants now occasion, and jurisdiction in the case will be reserved. The rulings on requested findings and conclusions are marked on the original by the court, exceptions allowed thereon, all filed with the clerk and made part of the record of the proceedings.

Counsel should prepare decree.